No 9091.

## CATHERINE SHIELDS, WIDOW, ETC., ET. AL. VS. ARTHUR SHIFF.

Under the effect of a sale in proceedings for the condemnation and confiscation of an offender's property conformably to the Confiscation Act of Congress, of July 17, 1862, and to the joint resolution explanatory thereto, the offender is absolutely stripped of all rights, titles and claims to the condemned property, and hence he can make no valid disposition of the same, either by deed or will.

The purchaser at such a sale acquires nothing more than a life-estate. The fee simple of the property is then vested in and held by the United States in trust for, and for the benefit of, the heirs at law of the offender, who thus become owners of the fee in expectancy, during the life-estate.

The heirs succeed to the offender by virtue of the laws of nature and descent; and not by operation of the confiscation laws, which merely recognize pre-existing rights.

The heirs of blood of the person whose property has been confiscated, are not third parties, *quoad* such property during the life estate, hence they are affected and bound by the foreclosure of a pre-existing mortgage on said property, and by the divesture of the title

to the fee operated by such proceedings. Hence they cannot be heard to urge the nullity of such proceedings, on grounds which the expropriated party could not be allowed to set up, if he were living and restored to all his former rights.

APPEAL from the Civil District, Court for the Parish of Orleans.
    *Tissot*, J.

----

*Breaux & Hall* for Plaintiffs and Appellants.

1. The Federal Statute must be interpreted according to common law principles, the common law being a part of the Government itself. Story on the Constitution, § 157, vol. 1; Journal of Congress, October, 14, 1874, p. 27; McCool vs Smith, 1 Black Rep. 465; Mayo vs. Wilson, 1 N. H. 55; How vs. Peckham, 6 Howard, Practice Rep. 229.

2. Words and expressions having a well known and definite meaning at common law must be given that meaning. Dwarris on Statutes (Gould & Son's Ed.), p. 186.

3. And words in a statute must be taken in their natural and obvious sense, and not in a sense unreasonably restricted or enlarged. Martin vs. Hunter's Lessee, 1 Wheaton, 326.

4. The language and purpose of the Confiscation Act of 1862, was to divest the offender of the fee and all interest in the confiscated property; this, upon decree of forfeiture, it did absolutely and unqualifiedly; thus placing the property completely beyond the reach of the offender, so that he could affect its title or destination by no act of his. Pike vs. Wassel, 94 U. S. 714; French vs. Wade, 102 U. S. 132.

5. The fee to confiscated property, vested in the Government of the United States, subject to defeasance for the benefit of the heir apparent. Blackstone Comm., vol. 2, p. 381; Wallach's case, 11 Wallace, 209; Pike vs. Wassel, 94 U. S. 714; French vs. Wade 102 U. S. 132.

6. The results of confiscation and forfeiture were two-fold under our law; in so far as the fee to the property was concerned, as in England, it vested in the sovereign or government; in so far as the *heir apparent* was concerned, a distinct and different result obtained; the fee was held subject to reversion to the heir apparent, the beneficiary under the resolution explanatory of the act. Pike vs. Wassel, 94 U. S. 714; French vs. Wade, 102 U. S. 132.

7. At common law, when the word heir, or its equivalent is used, the *heir apparent* is meant, he upon whom the law devolves the estate at the death of the ancestors. Lockwood vs. Jessup, 9 Conn. 274; Leach vs. Cooke's Lessee, Cook, Tenn. Rep. 252; Bouvier's Law Dictionary, verbo Heir; Dwarris on Statutes, p. 199; Cox vs. Beltshoover 11 Mo. 142;

8. To so construe the confiscation Act as to permit to offender, to control the property by permitting him to institute as devisee or legatee for it, is to defeat the very purpose and intent of the Act, which is to prevent him from affecting its title or controlling its destination in any manner whatsoever.

9. The confiscation Act contemplated only the reversion of the fee for the benefit of the parties *in esse*, viz., the heir apparent: and not to a variety of devisees and legatees, which under the different systems in the different States, could be instituted by the offender. Such differences could not have been contemplated within the Act; the construction that admits them, is, therefore, erroneous.

12. Where the foreclosure of property in third hands, is sought upon a prescribed claim and a mortgage lapsed for want of re-inscription, the title of such third person is not affected by such proceeding. State of Louisiana vs. Citizens' Bank, 33 Ann. 708;

13. The heir apparent in the instant case, is not bound by the proceedings invoked, because he takes through the Government and not through the offender.

14. The reversion of the fee to the next of kin by the act of the Government has no foundation in law, depending entirely on its generosity, constitutes no basis for the action of

any legal principle. It can neither be assigned, nor does it descend to the heir. Heirs of Emerson vs. Hall, 13 Peters, 413 ;

*T. Gilmore & Sons* for Defendant and Appellee.

1. In a sale of property confiscated under the Act of Congress of July 17, 1862, all that could be sold was a right to the property seized, terminating with the life of the person for whose offense it was seized. Such proceedings, and the sale thereunder, do not effect the rights of mortgage in favor of third persons on the property, which goes to the owner of the property *cum onere.* Avegno vs. Schmidt & Ziegler, 35 An. 585; Day vs. Micou, 26 An. 18 ; Ib. 18 Wall. 162; Mercuard et al., 20 Wall. 115; Bigelow vs. Forrest, 9 Wall. 339 ; Waples vs. Hays, Morrison's Trans., vol. 5, p. 73 ;

2. The death of the offender terminates the right of the purchaser, and the property goes to the person whom the local law recognizes as the heir of the offender. Collaterals who are excluded from the succession by testament acquire no interest in the property. Wallach vs. Van Riswick, 2 Otto, 212; Pike vs Wassell, 4 Otto, 711.

3. The Act of Congress forfeited the property for the life of the offender, but for his life only. It did not forfeit his testamentary capacity, or introduce into the local law a new order of succesion.

4. A mortgagee, under an act containing the pact *de mon alienando,* can proceed against the mortgagor as though the latter had never been divested of his title. Avegno vs. Schmidt, 35 An. 585.

5. This is a petitory action. Plaintiffs must recover upon the strength of their own title, and not upon the weakness of their adversary's. They cannot in this form of action assail the defendants'. Tregre vs. Baudry, 23 An. 18; Barbee vs. Perkins, Id. 331 ; Delespare vs. Warner, 14 An. 413; D'Orgenoy vs. Droz, 13 An. 382; Collins vs. Collins, 10 L. 269 ; Haydel vs. Roussel, 1 An. 37; Winn vs. Elgee, 6 Rob. 102. Nor can they be heard to say—claiming as heirs of Surget—that the inscription of the mortgage had lapsed. See authorities in body of brief.

---

The opinion of the Court was delivered by

POCHÉ, J. Plaintiffs sue as the sole heirs of blood of the late Eustace Surget, for the recovery of immovable property which he once owned in the city of New Orleans, and which was confiscated under the legislation of Congress, of July 17, 1862, generally known as the "Confiscation Act."

They allege that under that legislation, the property in contest, which had been adjudicated under the confiscation proceedings to the defendant, Shiff, reverted to them as the legal heirs of Surget, who died on the first of February, 1882.

For answer, the defendant pleaded a general denial, and asserted his ownership of the property under a title from the sheriff of the parish of Orleans, by virtue of a writ of seizure and sale, issued in June, 1880, in his suit against Eustace Surget, for the foreclosure of a mortgage securing the unpaid balance of certain promissory notes which he then held.

Plaintiffs have taken this appeal from a judgment rejecting their demand and recognizing the defendant as the lawful owner of the property.

The salient and undisputed facts in this case are as follows:

Eustace Surget acquired the property in April, 1860, and as part of the purchase price, he assumed the payment of notes secured by mortgage on the same, executed by his vendor, amounting in capital to $24,000.

The property was confiscated in January, 1865, and sold in April following for $22,000, to the defendant, Shiff, who had in the meantime become the holder of the notes assumed by Surget at his purchase. After deducting costs and taxes, the balance of the proceeds of the sale were paid over to Shiff, who had intervened in the confiscation proceedings, and who applied said proceeds to the satisfaction *pro tanto* of his notes.

As the mortgage which secured his notes contained the *pact de non alienando*, Shiff obtained executory process in June, 1880, by proceeding against Eustace Surget directly, for the payment of the unpaid balance due on his notes; and the defendant being an absentee, the proceedings were carried on contradictorily with an attorney appointed by the court to represent him. The property was adjudicated to Shiff on the third of August, 1880.

Eustace Surget died in France on the first of February, 1882, leaving a last will, in which he instituted his wife, who survived him, his universal legatee.

Plaintiffs are shown to be the relatives of Surget in the nearest line, and to be his sole heirs at law.

Under our views of the controversy, in the light of the established jurisprudence on the true and correct meaning of the Confiscation Act, the pivotal issue in the case hinges upon the validity of the sale effected under the executory process instituted against Surget by the defendant, Shiff, in June, 1880. A proper solution of that issue involves a consideration of the question of the effect of the confiscation on the perpetual ownership or fee of the confiscated property.

In the recent case of Avegno et al. vs. Schmidt & Ziegler, 35 An. 585, we had occasion to consider some of the effects of proceedings instituted under that legislation.

Under the guidance of numerous decisions of the Supreme Court of the United States, we established in that Court the following propositions, which are, to some extent, involved in the present controversy, and which we shall, therefore, abstain from discussing in this opinion :

1. The act of Congress, of July 17, 1862, generally known as the "Confiscation Act" and the joint resolution of the same day explanatory thereto, must be construed together.

2. In a sale of property confiscated thereunder, all that could be sold was a right to the property seized, terminating with the life of the person for whose offense it had been seized.

3. Such proceedings and sale do not affect the rights of mortgage existing in favor of third persons on the property which goes to the government or to the purchaser *cum onere*.

4. A mortgagee, under an act containing the pact *de non alienando*, can proceed against the mortgagor, after the latter's expropriation through confiscation proceedings, as though the latter had never been divested of his title. Bigelow vs. Forrest, 9 Wall, 339; Day vs. Micou, 18 Wall. 160; Waples vs. Hays, Morrison's Transcript, vol. 5, No. 2. Under the principles thus laid down, resting on the high authority of the first tribunal of the land, and which we do not understand to be contested by either party in the case at bar, we conclude that the following propositions can be considered as fully established in the present controversy.

1. That the title which Shiff acquired at the confiscation sale in May, 1865, expired with Surget at his death in 1882.

2. That the mortgage rights of Shiff on the fee of the confiscated property for the security of the unpaid balance of his notes were not affected by that sale; but remained in full force, notwithstanding his acquisition of a life-estate in the property, and his possession and enjoyment of the same under his title; and that in this case there was no extinction of either the debt or the security by reason of confusion, as provided in our Code.

In this connection, we must here remark that we are in perfect accord with plaintiff's counsel in their well supported argument that the "Confiscation Act", a Federal statute, must be construed and interpreted in all its effects, under the rules and principles of the common law. To hold otherwise would be to run counter to all the decisions on this subject of the Supreme Court of the United States, the tribunal of all others so eminently, not to say exclusively, qualified to expound in the last resort all legislation emanating from the Congress of the United States, but above all to interpret a legislation so peculiar in its character, the outgrowth of a terrific civil war, and a relic of the feudal system once prevalent in England.

Hence we cannot consider with any favor, the contention of the defendant's counsel in their advocacy of the proposition that after confis-

cation, the offender had any right or interest, or remainder in and to the property thus wrested from him by the strong arm of the govern- ment.

Under the common law the absolute ownership of the confiscated property was irrevocably vested in the sovereign. If the act of July 17, 1862, had not been immediately followed, and naturally modified, by the joint resolution explanatory thereto, it follows as a logical conclusion that its intended effect in the minds of its framers would have been to completely forfeit the property from the offender and to vest it absolutely in the government, with full power to transfer it to a purchaser under an absolute title. But, in our opinion, that intention would have been controlled by, and would have yielded to the counter check of that portion of the Constitution, which had its effect on the legislators and drew from them the restrictive declaration contained in their joint resolution. But the effect of that restriction operated only on the nature of the title which the government acquired under the confiscation, and not on the divesture of the offender's title, which remained complete and final.

Hence, in treating of this subject in the case of Wallach et al. vs. Van Riswick, 92 U. S., p. 209, the Supreme Court of the United States uses the following strong and unambiguous language :

"It was not doubted that Congress might provide for forfeitures effective during the life of the offender. The doubt related to the possible duration of a forfeiture, not to the thing forfeited, or to the extent and efficacy of the forfeiture which it contained. It was to meet the doubt that did exist, that the resolution was adopted. 　*　　*　　*　　*　　* Plainly it should be so construed as to leave it in accord with the general and leading purpose of the act of which it is substantially a part, for its object was, not to defeat, but to qualify. That purpose, as we have said, was to take away from an adherent of a public enemy his property, and thus deprive him of the means by which he could aid the enemy. 　*　　*　　*　　*　　* The obvious meaning is, that the proceedings for condemnation and sale shall not affect the ownership of the property after the termination of the offender's natural life. After his death, the land shall " pass or be owned as if it had not been forfeited. Nothing warrants the belief that it was intended that, while the forfeiture lasts, it should not be complete, viz: a devolution upon the United States of the offender's entire right." The same doctrine was announced in the case of Pike vs. Wassel, 94 U. S. 711, and was re-affirmed in the case of French vs. Wade, 102 U. S. 134;

and in the language of that exalted tribunal we may hold that "It must now be construed as the settled rule of decision in that Court."

The practical effect of that rule on the case now before us, is that after the condemnation, the property was completely and absolutely wrested from Surget, who lost all control over or connection with it, to such an extent that a transfer of that property from Shiff under his confiscation titles, to Surget, would have vested in the latter nothing more than a life-estate. 102 U. S. 134.

Hence it is a safe, and in fact, an unavoidable conclusion that he could make no disposition whatever of the property which could bind the government, his presumptive heirs or any other party. Hence his honest intention in ratifying the title acquired by Shiff at the confiscation sale could produce no effect, and did not complete the latter's title. Chaffraix vs. Shiff, 92 U. S. 214.

It is, therefore, clear that he could not dispose of the property by will, and that the *status* of that property was not, as it could not be, affected by his last will, made in France in the year 1872.

These considerations justify the conclusion that at the death of Surget, in 1882, the property reverted to plaintiffs, his legal heirs, unless the fee was divested by the executory process instituted by Shiff in 1880.

It will be noticed that in our decision of the Avegno case, we guardedly omitted to express any opinion as to the effect of the confiscation on the fee, which we intimated to have been vested either in the government or in the purchaser at the confiscation sale. The decision of that point was not necessary to the solution of the issues in that case but the necessities of this case require a discussion of that important question. As the Supreme Court of the United States has thus far eschewed that discussion, the task is hazardous and not free of difficulty.

But although that exalted tribunal has not yet undertaken to finally "determine where the fee dwelt during the life-estate," we are not left without some guidance from the wisdom of its utterances in our search for light on the subject.

As we have shown above, the absolute forfeiture of the offender's title has been held by that Court as the immediate effect of the confiscation—and the Court has also settled that the second effect was "a devolution upon the United States of the offender's entire right." This certainly and inevitably includes the fee, but under the effect of the joint resolution, the fee in the government was not to be perpetual; its duration depended upon, and was limited by, the duration of the life

of the offender, at whose death the fee reverted absolutely and forever to his heirs at law. · Hence we conclude that during the life estate, the fee dwelt in the government in trust for, and for the use of, the presumptive heirs of the offender. This conclusion is fortified by the language of the Supreme Court in the case of Pike vs. Wassell, 94 U. S. 711, in which the presumptive heirs of the offender attempted, and were allowed, to regulate the administration of the property in some particulars by the life tenants. The Court said :

"It is true, as a general rule, that so long as the ancestor lives the heirs have no interest in his estate, but the question here is as to the rights which the Confiscation Act has conferred upon the heirs apparent or presumptive of one whose estate in lands has been condemned and sold. In Wallach vs. Van Riswick, without undertaking to determine where the fee dwelt during the life-estate, we decided that it was withheld from confiscation exclusively for the benefit of the heirs. They, and they alone could take it at the termination of the life-estate. The children of Albert Pike, as his heirs apparent, are also apparently the next in succession of the estate. Either they or their representatives must take the title when their father dies. If they do not hold the fee they are certainly the only persons now living who represent those for whose benefit the join resolution of Congress was passed. They, at least, appear to have the estate in expectancy. Under these circumstances, as there is no one else to look after the interests of the succession, we think that they may be properly permitted to do whatever is necessary to protect it from forfeiture or incumbrance."

We have made this copious quotation from that masterly opinion, not only because it amply bears out our conclusion that during the life estate the fee was held by the Government and owned in expectancy by the presumptive heirs, but for the additional reason that it effectually explodes the very erroneous theory advocated by plaintiffs' counsel to the effect that the reversion of the fee to the next of kin by the act of the Government has no foundation in law, but depends entirely on its generosity. The very reverse is the truth ; the whole policy of the joint resolution was to restrict the effect of the condemnation so as not to affect the rights of the heirs of blood—hence it provided that " no punishment or proceedings under said act shall be so construed as to work a forfeiture of the real estate of the offender beyond his natural life." The next of kin, therefore, succeeds to his author, through the laws of nature and of descent, and not through the effect of the confiscation law, which was shaped and circumscribed so as not to sus-

pend or interfere with the natural and legal preëxisting rights of succession of the heirs of the blood.

The advocacy of this extraordinary theory by plaintiffs' counsel was dictated by the necessities of their case; for under their system of attack against the validity of defendant's executory process, it becomes urgent that during the life of the offender they should have occupied the *status* of third parties towards the property in litigation. For the purpose of attack they claim to be third parties, but for the purpose of realizing the fruits of succession they are transformed into heirs of the blood. The position is manifestly contradictory and absolutely untenable. If they are the donees of the United States and not the legal representatives or presumptive heirs of Eustace Surget, they are strangers in the cause—and there is no case before us.

But under their own allegations, supported by the best of evidence, they are the nearest living relations, and they were in 1880 the presumptive heirs of Eustace Surget; and, therefore, they were not third parties *quoad* the mortgage foreclosed by defendant in his executory process.

Hence, it follows that they can draw no comfort or relief from the want of re-inscription of defendant's mortgage, and hence it follows that they are concluded by the failure or refusal of Surget to plead the prescription on Shiff's notes, which is now set up for the first time by them as a bar to the foreclosure of defendant's mortgage in 1880.

Could they be allowed to set up the plea of prescription in bar of the exercise of a right which has been exhausted by judicial enforcement, a line of attack not sanctioned by our jurisprudence; this plea would be met and defeated by a codicil in Surget's will, added thereto in 1879, in which codicil he solemnly charged his executrix with the noble mission of doing everything in her power to complete the title of defendant to the very property now in litigation, as an honest satisfaction of the very debt which his heirs at law now seek to avoid and defeat. Under the principles announced by the Supreme Court of the United States in the Pike case, these plaintiffs who were then, as they are now, the only presumptive heirs of Surget, could and would have been permitted to defend the seizure and sale of this property in 1880. Evidently they were not third or disinterested parties *quoad* that proceeding and they are bound by its effect.

All these considerations naturally lead to the legal conclusion that the fee was vested in the purchaser at the Shiff's sale in August, 1880,

and that the defendant, Shiff, is the lawful owner of the property claimed by plaintiffs.

Judgment affirmed.

I concur in the decree, TODD, J.

CONCURRING OPINION.

BERMUDEZ, C. J.  I concur in the opinion and decree just read, which appear to be in furtherance of the federal jurisprudence, as expounded by the U. S. Supreme Court itself.  I consider that it is necessary, in order to meet the issue presented, to ascertain and determine where the *fee* dwelt after the condemnation and sale of the property, and that the conclusion arrived at may be reached from another standpoint.

Writing on the right of property, civilians say, that ownership is perfect or imperfect.  Ownership is the right by which a thing belongs to some one in particular, to the exclusion of all others.  It vests in him who has the immediate dominion of it and not in him who has a mere beneficiary right.  It is perfect when perpetual, and when the thing unincumbered with any real right toward any other person than the other.  It is imperfect, when it is to terminate at a certain time or on a condition.

It is of the essence of the right of ownership that it cannot exist in two persons for the whole or entirety of the same thing.

The ownership of Surget was *ab initio* perfect, that is unqualified and therefore perpetual.

The forfeiture arising out of his aid to the rebellion deprived him of the full or absolute ownership for the term of his natural life from the time of confiscation and condemnation.

The decree of condemnation and sale vested an imperfect ownership in the United States which was to terminate when Surget should die.

It dismembered his perfect ownership into two imperfect ownerships, the one a complement of the other; both parts of one and the same whole.  When this severance took place, the United States became the owner of the one; Surget remained the other of the owner.  Nothing in the act suggests any other ownership; nothing in the opinions of the United States Supreme Court suggests any other individual as the absolute owner of the fee, until *after* the death of Surget.

In the case of Rankin, 6 Mon. Ky. 531, a similar question was presented and was solved in the same sense.

A person under sentence of death for murder made his will and died before the execution of the sentence.

One Court said : The validity or invalidity of the will depends upon the question whether, by the laws of the State, the testator forfeited the *whole* of his estate upon being convicted of the murder. If, on the conviction, the whole of his estate was forfeited, there was nothing he could transmit to others and the will would be inoperative; but, if notwithstanding, there was not an entire forfeiture of all his estate, he was capable of disposing of his interest not forfeited and as to that interest, be it what it may, his will can have an operation and must be adjudged valid.

The statute of the State disposed of all the estate forfeited to the Commonwealth, by directing it should pass and descend to his heirs. The question still remained, whether the whole estate of the offender was, upon his conviction of felony, forfeited to the Commonwealth. The constitution of the State contained this clause : " That no attainder shall work corruption of blood, nor (except during the life of the offender) forfeiture of estate to the Commonwealth."

" Not the absolute fee simple estate of the offender in lands and goods that according to the Constitution was forfeited to the Commonwealth on attainder or conviction of felony; but it was the interest or estate which the offender was entitled to during his life that by the law in force at the passage of the act, was forfeited. The reversionary interest, or in other words that part of the estate which remained *after* the death of the offender, according to those laws, resided in him after conviction, must still be understood to reside in the offender, though attainted or convicted." See Borland's case, 4 Mason, 174.

Under the confiscation law, the *fee*, the perpetual ownership, could not be and was not *forever* divested. The explanatory or restrictive resolution of the original act is explicit on the subject, but in the absence of any such legislation, declaration or abridgment, the original act would have been impotent to have accomplished that object, because of the insuperable inhibition of the Constitution, which forbids forfeiture beyond the term of the offender's life.

Had not the resolution been resisted by the Executive, or passed notwithstanding, the potent arm of the highest tribunal in the land would undoubtedly, at the proper time, have struck a fatal blow, branded the high-handed measure and denounced it as a lifeless form which should never have seen the light of day.

The fee then continued to dwell in the offender, but barren of any profit, good or advantage to him; without any right on his part to make it available in any manner during his life, though it necessarily remained subject to claims upon it. It is "incredible that lawyers, while providing for the confiscation of an enemy's land, intended to leave in that enemy a vested interest he might sell and with the proceeds of which he might aid in carrying the war against the Government."

It can only be upon the theory that the fee was not absolutely divested, that the creditors anterior to the law, whose claims were secured by lien or mortgage, and have been recognized the right of coercing payment by subjecting the property, notwithstanding confiscation and sale, and that at the offender's death it passes to his heirs, who take as though no forfeiture had ever occurred.

It is true that the proceeding is *in rem*, but the law of the *situs* requires it to be conducted contradictorily with the owner, in order that the judicial sale may operate a valid divestiture of the title or fee, even if the defendant were not the owner of the fee at the date of the proceeding and sale following.

But even assuming and conceding that the offender Surget was actually divested of his entire ownership, perfect and imperfect, and that the fee vested in the United States, the divestiture would not be entitled to more effect than it would have if Surget had himself, in the absence of any condemnation and sale, voluntarily parted with his ownership of the property.

In such a case, under the terms of the contract of sale on which Shiff bases his claim, the alienation of the property by Surget could not have prejudiced him, as it contains the clause *de non alienando*, which under the laws of this State authorizes him to proceed in the enforcement of his debt against the original debtor and mortgagor regardless of the transfer, and ignoring it,—the property passing to the transferree or purchaser, *cum onere*, or subject to that clause.

From that standpoint, it is therefore immaterial whether the fee remained in Surget or passed to the Government. It was divested by the proceeding of 1880, and vested in Shiff.

Prescription is a means of defense created by the law for the necessity of things to which the individuals in whose favor it exists may have recourse or not as they may deem better. They are under no obligation to set it up. When, therefore, they are sued in a case in which they could urge it, and do not do so, they are deemed to have waived

the benefit of it. Under such circumstances, those who take from them, their heirs and assigns, are as equally estopped from pressing it as effectually as the debtor himself.

As Surget did not set up prescription or peremption, prior to the sale of the property, but on the contrary waived it and recognized title in Shiff, as is shown by his silence and his will, the claim of Shiff continued in existence, was legal and valid, and the expropriation became complete in his favor as creditor, purchasing as if there never was any prescription law.

Those and any other defenses which could have been and were not set up by Surget before the sale, the plaintiffs—who are Surget's heirs and successors, and who have acquired no rights which he did not possess and could not have exercised—cannot be permitted to assert and urge after his death.

I, therefore, concur in the decree.

## CONCURRING OPINION.

MANNING, J.   One of the appalling consequences of attainder in England was the corruption of blood, whereby its heritable quality was destroyed, and the person attainted was incapacitated from taking lands or other hereditaments from his ancestor, or retaining those he already had, or transmitting them by descent to any heir.   This consequence was forever averted from our country by the explicit constitutional declaration that while Congress shall have power to declare the punishment of treason, no attainder shall work corruption of blood nor shall any forfeiture extend beyond the life of the person attainted. And therefore an Act of Congress which should assume to confiscate the fee would be unconstitutional and null, and does not need an accompanying explanatory resolution to confine and restrict its operation.

Since then corruption of blood is not produced, and cannot be, by any proceedings for attainder or confiscation, the capacity to take, retain, and transmit lands is not affected, except by a forfeiture pronounced, and that cannot extend beyond life.   Thus as the government cannot in any manner touch the fee, so it cannot for any purpose hold the fee.

The fee must therefore either remain in the obnoxious party with power to dispose of it by will, in which event the plaintiffs have no interest, and subject to a forced alienation of it by creditors, in which event the defendant acquired a good title, or it must be in abeyance during the continuance of the life estate.   In either case, the proceed-

ings taken by the creditor have divested and transferred the fee to the purchaser under the executory process, and his title is therefore unassailable.

I concur in the decree.

### CONCURRING OPINION.

FENNER, J. I think it desirable to avoid, as far as possible, any decision upon vexed questions arising under the confiscation laws, not absolutely essential to the determination of the instant controversy. Whatever inferences may be drawn from the expressions used by the Supreme Court of the United States in discussing the effect of those laws, that tribunal has not, as yet, explicitly decided whether or not condemnation and sale under them, operates to destroy the will-making power of the owner, as to real estate. I prefer not to anticipate the decision of that Court upon this purely Federal question. If we can decide this case upon the strength of defendant's title, we need not concern ourselves about the weakness of that of the plaintiffs.

I am equally indisposed to vex my mind with the consideration of the metaphysical problem as to where the fee of this property resided during the life-time of Surget, the solution which has been, thus far, consistently declined by the Supreme Court of the United States.

For the purposes of this controversy, it matters not where the fee resided. Wherever it was, the Supreme Court has unequivocally settled the doctrine that it remained subject to prior mortgages and privileges in favor of third persons, which were entirely unaffected by the confiscation proceedings.

Neither did those proceedings affect the debt due by Surget to Shiff, which was secured by mortgage.

The object and effect of the pact *de non alienando*, under our law, are to secure to the mortgage creditor the right to foreclose his mortgage by executory process directed solely against his original debtor, and to seize and sell the mortgaged property, regardless of any subsequent alienations.

We make a long step towards eliminating irrelevant questions and exposing the real and pivotal question in this case, when we announce, as an indisputable proposition, that if the executory proceedings against Surget were regular ; if, at the date thereof, the debt subsisted; if the mortgage securing the same were valid and had been preserved by proper inscription and re-inscription—the purchaser at the sale un-

42

der those proceedings would have acquired a valid title against all the world, regardless of who owned the fee at the date thereof.

Indeed, I do not understand that the learned counsel of plaintiffs would dispute this proposition. They claim that the title is invalid, as against plaintiffs, on two grounds, viz:

1. That, at the date of the foreclosure proceeding, the debt of Shiff had been extinguished by prescription.

2. That his mortgage had lapsed, as to them, by the failure to re-inscribe it within the term prescribed by law.

At this point we encounter other elementary propositions, too plain for dispute, establishing that, whatever force the above objections might have if urged by third persons, they have none in favor of the mortgagor or his heirs. As to prescription, the mortgagor having failed to plead it, its effect is forever lost as to him and his heirs. As to the want of re-inscription, neither inscription or re-inscription is necessary to preserve the mortgage as against the mortgagor and his heirs.

By this process of elimination, we reduce this controversy to a single question, viz: are the plaintiffs, heirs of Surget, claiming title by virtue of inheritance through him; or are they third persons as to him, deriving title from the bounty of the United States conferred upon them under the merely descriptive quality of heirs of Surget?

They have their right upon the latter hypothesis.

If we confine ourselves to the plain language of the Acts of Congress, it is difficult to discern any foundation for such a theory. In the Act of July 17, 1862, and the explanatory joint resolution, taken together, Congress provided for the seizure and condemnation of enemies' property, and declared that, when condemned, it should " become the property of the United States, and may be disposed of as the Court shall decree, and the proceeds thereof paid into the Treasury for the purposes aforesaid ; but no punishment or proceedings under this Act shall be so construed as to work a forfeiture of the real estate of the offender beyond his natural life."

This is precisely what Congress has said, and all that it has said, on this subject.

It has not assumed to say who should take the property after the offender's death. It has not declared that, at his death, the property should vest in the offender's next of kin or in the persons who, under the *lex loci rei sitæ*, would be his heirs. If such were the case, the contention of plaintiffs might find strong support. But Congress has simply declared that the proceedings shall not operate upon the property

at all beyond the period of the offender's natural life. At that moment they cease to have effect and are as if they had never taken place.

Suppose the provision had been that the proceedings should not " work a forfeiture of the real estate of the offender beyond " the period of twenty years from their date. At the expiration of that term, would not the offender, if still alive, resume the property? If he were dead, would not his heirs take it? And why would they take it? Simply for the reason that he *was* dead, and that they were his heirs, and, as such, entitled to take whatever would belong to him, if living.

And so, under the law as it is, Congress has not touched the property for any period beyond the offender's life. However absolute the ownership of the United States, no property in the thing beyond that period ever passed to the United States. Congress has never said a word about the estate after the death. At that moment the ownership of the United States ended. The "forfeiture of the real estate of the offender" ceased to have effect. Nothing disturbed or divested the offender's ownership except the forfeiture and that divestiture could only continue so long as the forfeiture had effect. A forfeiture for a term cannot extend beyond the term; and when the term expires, the estate divested thereby revests in the original owner, if living, in his heirs, if dead.

We are not concerned here with questions which might arise as to whether, under the common law of real property, the fee is susceptible of dismemberment or of being in abeyance, or *in gremio legis* or *in nubibus*. We are dealing here with a statute, the exercise of legislative power, which modifies and changes existing laws according to its will. If Congress had power over the subject-matter, it could dismember the fee, or place it where it chose. The word *fee*, in its ordinary use, embodies a composite idea. Discarding the feudal characteristics of the English system, Mr. Abbott gives the following definition : " In American law, a fee is an estate of inheritance without condition, belonging to the owner and alienable by him or transmissible to his heirs absolutely and simply."

Such an estate existed in Surget, as to this property, prior to its condemnation. Now, the Act of Congress, as interpreted by the Supreme Court of the United States, destroyed certain elements of Surget's fee. It annihilated his ownership during his life. It destroyed absolutely his power of alienation. We may concede, for the sake of argument, that it destroyed even his testamentary capacity in relation to this property. But it unquestionably left in him the faculty of transmit-

ting to his heirs absolutely and simply, because that is a faculty coming into play only at the moment of his death, and when the forfeiture terminated and ceased to have any effect whatever on his rights.

Plaintiffs cannot claim title to this property after Surget's death, as derived from the United States, because the United States never took or held any such title. They cannot claim that the United States, in the exercise of legislative power, transferred the estate directly from Surget to them, irrespective of their right of inheritance, because no such transfer is found in the statute, and no language susceptible of any such construction.

Their only title rests upon their right of inheritance from Surget—upon their being his legal heirs—the beneficiaries of the right, vested in him and never forfeited, to transmit this property to his heirs.

Conceding the destruction of Surget's testamentary capacity, the utmost they could claim would be the position of *forced heirs* under our law, whom the ancestor could not disinherit. But even such heirs, though treated in our law in many respects as creditors, could not oppose to the title of defendant herein the defenses of prescription of the debt or lack of reinscription of the mortgage.

The learned judge of the court *à quâ* rejected the demand of plaintiffs on the ground that Surget's testamentary capacity was not affected by the confiscation proceedings and that his instituted heir succeeded to his rights at his death.

Without intimating any opinion on that question, I have preferred to avoid it and to reach the same decree on different grounds.

For these reasons, I concur in the decree.

Rehearing refused.

---

This case is pending on a writ of error in the Supreme Court of the United States.

REPORTER.