**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 96-30237
_____

IN THE MATTER OF:  DIBERT, BANCROFT
& ROSS COMPANY, LIMITED; Debtor,

JOHN ROSS, Deceased, GLORIA ROSS,
individually and as the duly
appointed Administratrix of the
Succession of John Ross, substituted
as a party plaintiff in place and
stead of John Ross; CAROLYN ROSS;
KATHLEEN PENICK; HANCOCK NATIONAL
BANK,

                                              Appellants,

                            versus

ROBERT L. MARRERO, CENTRAL
PROGRESSIVE BANK; DIBERT, BANCROFT
& ROSS COMPANY, LIMITED; UNITED
STATES OF AMERICA,

                                              Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

June 30, 1997

Before JOLLY, JONES and WIENER, Circuit Judges.

WIENER, Circuit Judge:

      This appeal arises from the bankruptcy proceedings of Dibert,

Bancroft & Ross Company, Limited ("the Debtor").  Appellants ("the

Ross Group"[1]) appeal the judgment of the bankruptcy court, as affirmed by the district court, rejecting the Ross Group's claim and recognizing the claim of the Internal Revenue Service of the United States Department of the Treasury ("the Government"). Specifically, the court awarded to the Government the proceeds of a court authorized sale by the Debtor's trustee in bankruptcy of property located in Amite, Tangipahoa Parish, Louisiana, and at the same time denied the Ross Group's claim to those proceeds. Agreeing with the Ross Group that its collateral mortgage claim to those proceeds subsists and primes the Government's tax lien claims, we reverse the ruling of the bankruptcy court that awarded those sales proceeds to the Government, render judgment awarding the proceeds to the Ross Group, and remand the case to that court for further proceedings consistent with this opinion.

## I

### FACTS AND PROCEEDINGS

#### A. The Sale and Leaseback Agreement

In 1965, the Debtor entered into an industrial inducement financing arrangement with Tangipahoa Parish ("the Parish"), crafted as a sale-and-leaseback with right of redemption ("the Lease"), under the terms of which the Debtor would (1) purchase property in Amite, (2) construct a foundry on it to replace the

---

[1] Collectively, Hancock National Bank, Raphael Ross, Jr. (whose interest was later assigned to Carolyn Ross), Kathleen Penick, John Ross (now deceased), and Gloria Ross, together the original secured creditors as collateral mortgagees of Debtor's leasehold interest in property in Tangipahoa Parish, Louisiana. See infra note 8.

2

Debtor's New Orleans facility that had been badly damaged by Hurricane Betsy, (3) transfer record title of the improved property to the Parish, reserving the right to reacquire record title by exercising a so-called repurchase option and paying a nominal amount to do so, and (4) without ever relinquishing possession, immediately lease the property back from the Parish.[2]  Pursuant to the Lease, the Debtor purchased the land and built an iron and steel foundry, pattern shop, and machine shop on it (collectively, "the Foundry").  When construction of the Foundry was completed in 1967, the Debtor transferred record title of the Foundry to the Parish, including in the package all machinery and equipment that the Debtor had relocated on the property.  Contemporaneously with its transfer of title to the Parish, the Debtor leased the Foundry back from the Parish, retaining the right to redeem record title at (1) any time during the original term or extended term of the Lease (2) after repayment in full of the Parish's bond financing.

To raise the funds required to do the long-term financing deal with the Debtor, the Parish issued and sold general obligation

---

[2] In Louisiana, a lease of immovable (real) property is a hybrid, a personal contract which nonetheless enjoys a number of attributes of a real contract, including public records protection, the right to peaceable possession, the right to evict, and the like.  See 2 A.N. Yiannopoulos, Louisiana Civil Law Treatise, § 226, at 422-25 (3d ed. 1991); La. Rev. Stat. Ann. § 2721-2721.1 & 2754-56 (West 1991); and also Rivet v. Regions Bank of Louisiana, 108 F.3d 576, 580 n. 2 (5th Cir. 1997).  Significant here is that the personal contract of lease produces a right of the lessee to encumber his interest by use of the special mortgage, originally a pignorative device for hypothecating immovable property. See La. Civ. Code Ann. art. 3286(4) (West 1994) (providing that a "lessee's rights in a lease of an immovable with his rights in the buildings and other constructions on the immovable" are "susceptible of mortgage"); and id. rev. cmt. f.

3

bonds, then delivered the proceeds of the bond sale to the Debtor which used them to "take out" its interim construction loans. The bonds were secured by the Parish's record title to the Foundry and the Debtor's obligation under the Lease. The rental payments that the Debtor obligated itself to pay to the Parish under the Lease were calculated to amortize these bonds over the course of twenty years.

Section § 1901 of the Lease gave the Debtor as lessee the option to extend the Lease beyond the original twenty year primary term for five consecutive extension terms of five years each, at an annual rental of $10,000.[3] Section 2002 of the Lease spelled out the Debtor's right of redemption in the form of an option to repurchase the Foundry from the Parish for the nominal sum of $1,000 at any time after the bonds had been retired, provided the Lease was in effect and current at the time of the exercise of the option.

Almost twenty years later, in April 1986, the Debtor made the final payment to the Parish under the initial term of the Lease in a sum sufficient to retire the last of the bonds. Despite having thus entirely repaid the financing arrangement embodied in the Lease, the Debtor nevertheless found it economically advantageous not to reacquire record title to the Foundry immediately but

---

[3] These $10,000 per year lease payments, also known as "payment in lieu of tax" payments, or "PILOT" payments, amount to far less than the property taxes that Dibert would have owed had the foundry been on the Parish's ad valorem tax rolls. This explains the financial reason for a lessee's preference to extend the lease term, time and again, rather than exercising the right to reacquire record title immediately upon amortization of the bonds.

4

instead to exercise the first of its five year lease renewal options. Thus, at no time —— from the Debtor's original purchase of land in the Parish and construction of the Foundry in the mid 1960's to the eventual bankruptcy sale of the Foundry to third parties in 1992 —— was the Debtor ever out of occupancy and possession of the Foundry property.

**B. The Collateral Mortgage**

Faced with a cash shortage at approximately the same time in 1986 that it was paying off the last of the "rent" under the initial term of the Lease, the Debtor borrowed approximately $447,000 from the Ross Group. This loan was represented by a Promissory Hand Note. Repayment of that note was secured by the pledge of a "Bearer" collateral mortgage note which was paraphed for identification with and thus secured by a leasehold collateral mortgage ("the Mortgage") in the amount of $2,000,000. Like the Lease, the Mortgage was duly recorded in the Office of the Recorder of Mortgages for the Parish in December 1986.

The Mortgage encumbered "all of the Debtor's leasehold interests in and to" the land on which the Foundry was constructed, as well as all the buildings and improvements situated on the premises and all machinery, appliances and equipment, all component parts, all immovables by nature and destination, and all corporeal movables. Also, by its own terms, the Mortgage was made subject to all terms and conditions of the Lease, which was conditionally assigned to the holder of the Mortgage.[4]

---

[4] See infra note 6.

The Ross Group and its successors in interest have at all times remained in possession, as pledgees, of the collateral mortgage note secured by the Mortgage. Although the Mortgage does not contain an express "after acquired property" clause,[5] it does contain — in addition to a standard "pact de non alienando" by which the Debtor as mortgagor was obligated "[n]ot to sell or transfer the Property without the prior written consent of the Mortgagee [the Ross Group]" — an analogous but more specific covenant in § 11(1)(3), which expressly applies "[i]n the event that the Property shall consist of Mortgagor's interest in a leasehold estate and/or lease."[6]

---

[5] An "after acquired <u>property</u>" clause, as distinct from an "after acquired <u>title</u>" provision, operates to allow a mortgage to encumber immovable property that the mortgagor does not yet own at the time that the mortgage is executed but is subsequently acquired by the mortgagor. Such clauses have been recognized as lawful special mortgages in Article 3292 of the Louisiana Civil Code, which "combines and clarifies the provisions of Former Civil Code Articles 3308 (prohibiting the mortgage of 'future property') and 3304 (validating a mortgage of property of which the mortgagor is not then the owner if the property is subsequently acquired)." La. Civ. Code Ann. art. 3292 rev. cmt. (West 1994).

[6] The covenant at § 11(e)(3) provides in full:

Mortgagor will not surrender any of its leasehold interests hereinabove described, nor terminate or cancel the Lease, and will not, without the prior written consent of the Mortgagee modify, change, supplement, alter or amend the Lease, either orally or in writing, and any such termination, cancellation, modification, change, supplement, alteration or amendment of the lease without prior written consent of the Mortgagee shall be void and of no force and effect. As further security to the Mortgagee, Mortgagor does hereby deposit with the Mortgagee the original copy of the Lease and the Assignment thereof to be retained by the Mortgagee until all indebtedness secured hereby is fully paid.

The Debtor continued to suffer cash shortages, so it borrowed $500,000 from Central Progressive Bank ("CPB") in 1987 and gave CPB a first mortgage on the Rolling Mill, a facility constructed in the late 1960's on land owned by the Debtor adjacent to the Foundry. The Rolling Mill was not part of the Foundry sale and leaseback transaction between the Debtor and the Parish and was not encumbered by the Mortgage.

**C. The Act of Cash Sale and the Debtor's Demise**

Unable to eliminate its cash-flow problems despite those two borrowings, the Debtor shut down both the Foundry and the Rolling Mill in the summer of 1988. By the end of 1989, these facilities had been closed for more than a year and many employees had been laid off. In response, Parish officials publicly threatened to cancel the Lease and seize the Foundry even though the Lease neither expressly nor implicitly requires the Debtor to maintain any level of employment, and even though the Debtor continued to make its specified lease payments to the Parish.

Whether motivated by fear of political repercussions, the need to reorganize the business, or anticipation of seeking bankruptcy protection, the Debtor elected to recover its record title to the property by exercising its repurchase option under the Lease. Accordingly, on September 5, 1989, the Parish executed an Act of Cash Sale ("the Deed"), transferring record title of the Foundry and all associated machinery and equipment back to the Debtor for the nominal $1,000.00 specified in the option; however, the Deed was not immediately registered in the Conveyance Records of the

Parish. In the Deed, the Parish and the Debtor expressly recognized that (1) the Foundry was still subject to the Mortgage, (2) the encumbrance created by the Mortgage was still valid, (3) the Deed did not cancel the Lease and thus could not nullify the Mortgage, and (4) the Mortgage would continue to encumber the Foundry to the "fullest extent allowed by law."

On September 15, 1989, only ten days after the execution of the still-unregistered Deed, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code. The following summer, the Debtor's bankruptcy was converted to a chapter 7 proceeding, and Appellee Robert Marrero ("the trustee") was appointed trustee in bankruptcy for the Debtor. For reasons not apparent from the record on appeal, the Deed was not filed for record until September 1990, roughly a year after its execution and some months after the appointment of the chapter 7 trustee.

An unsurprising side effect of the Debtor's financial demise was its failure to pay various taxes. As a result of delinquencies in the payment of federal employment taxes, the Government had filed the first of several notices of federal tax liens in September 1988, approximately one year before the Parish executed the Deed and the Debtor filed its petition in bankruptcy. Additional pre-petition federal tax liens were filed in November 1988, January 1989, March 1989, and June 1989. The mortgage records of the Parish confirm that the Mortgage had been recorded prior to the recording of any of the numerous judicial mortgages (42 in total) and tax liens against the Debtor, including those

8

filed by the Government. Assuming its continuing validity, the Mortgage was at all times the most senior encumbrance against the Debtor's property in the Parish.

**D. The Trustee's Sale; Allocation of the Sale Proceeds**

After receiving joint and interdependent bids for the Foundry and the Rolling Mill, the trustee filed a motion in the bankruptcy court for authority to sell both facilities. The bid on the Foundry was submitted by Timco, Inc. and Southern Enterprises, Inc., in the amount of $495,412, and the bid on the Rolling Mill was submitted by Anne Guzzardo-Knight in the amount of $468,000.[7] As these bids were interdependent, the trustee urged the bankruptcy court either to approve or reject both bids in their entireties.

Several parties, including the Ross Group, objected to the trustee's proposed sale.[8] The Ross Group objected on the ground that it was the holder of the Mortgage which the Debtor had granted years earlier, and had made an offer to purchase the Foundry, subject to the Mortgage. According to the Ross Group, its bid was greater than the Timco and Southern Enterprises bid, which the trustee was considering.[9]

---

[7] Guzzardo-Knight's bid for the Rolling Mill also included a portion of the Foundry property, to which $19,000 of her bid was allocated.

[8] By this time members of the Ross family had formed Amite Castings, Inc. for the purpose of purchasing the Foundry from the bankruptcy estate. It was Amite Castings which filed the objection to the trustee's proposed sale; however, we continue to identify Amite as the Ross Group to avoid confusion.

[9] The Ross Group offered to bid the amount of the total debt on the Mortgage, some $867,334.00, including principal, interest and attorneys' fees.

9

The Ross Group also complained that the trustee's allocation of the bids between the Foundry and the Rolling Mill was arbitrary and contradicted a prior independent appraisal which had been conducted in conjunction with a previous attempt to sell the facilities. That appraisal had allocated three-quarters of the value of the properties to the Foundry (approximately $1,200,000) and one-quarter to the Rolling Mill (approximately $400,000). The Government agreed with the Ross Group that the allocation between the Foundry and Rolling Mill was not reflective of the previously appraised values or of the relative values of the Foundry and the Rolling Mill. Finally, the Ross Group argued that, as holder of the note secured by the Mortgage, it was entitled to a priority claim — superior to the claim of the Government under its tax liens — to the proceeds of any eventual sale of the Foundry.

Reserving the issue whether the Mortgage still provided a secured claim to the proceeds of the sale of the Foundry (the Government and the Ross Group being the only lienholders whose secured debts could be substantially or completely paid by the proceeds of the sale of the Foundry), the bankruptcy court, in October 1992, granted the trustee's application to sell the Foundry and the Rolling Mill. The court's order authorized the trustee to sell the Foundry to Timco and Southern Enterprises for $495,412.00, free and clear of all liens, to sell the Rolling Mill to Ms. Guzzardo-Knight for $468,000.00, subject to CPB's mortgage, and to hold the combined sales proceeds in escrow, pending further orders

10

of the court.[10]

The Ross Group appealed the bankruptcy court's order to the district court, seeking, inter alia, a reapportionment of the proceeds from the trustee's sale between it and CPB, the holder of the first mortgage on the Rolling Mill. In January 1993, the district court affirmed the bankruptcy court's sale order and dismissed the Ross Group's appeal.

E.   The Instant Action

1.   Interpleader

This litigation was commenced after the sale of the Foundry and Rolling Mill when the trustee filed an interpleader in the bankruptcy court to determine the proper disposition of the proceeds of the sale of the Foundry, which had been deposited into the registry of that court. The Ross Group, on the basis of the Mortgage, and the Government, on the basis of its tax liens, each insisted that it held the more senior lien on the proceeds of the

---

[10] Realizing that the Ross Group had the right, under 11 U.S.C. § 363(k), to bid in the Mortgage and the Government's competing tax lien claim of $270,921.75, the bankruptcy court offered the Ross Group the opportunity to bid $270,921.75 in cash (the amount of the Government's tax liens) plus a portion of the balance due on the Mortgage sufficient to make the Ross Group's total offer for the Foundry exceed the offer pending from Timco and Southern Enterprises. The court's proposal required the cash portion of the bid to be placed in escrow, and specified that if the Ross Group could establish that the Mortgage outranks the tax liens, the Ross Group would be entitled to recoup its cash. In other words, the court proposed to permit the Ross Group to bid its Mortgage except to the extent that it was in dispute. But the Ross Group was unable to come up with a deposit of 10% of the total bid, or $49,700, by the end of the next day after the hearing in which this opportunity was first presented. The court therefore authorized the sale of the Foundry to Timco and Southern Enterprises, and the Rolling Mill to Ms. Guzzardo-Knight.

sale of the Foundry.

**2.    The Government's Position**

The Government filed a motion for summary judgment, arguing principally that, under the Louisiana doctrine of <u>confusion</u>, (1) the Lease was extinguished, <u>ipso</u> <u>facto</u>, at the instant that the Debtor became the Foundry's owner by virtue of the execution of the Deed on September 5, 1989; and (2) upon extinction of the Lease, being the thing mortgaged, the Mortgage too was extinguished, <u>ipso</u> <u>facto</u>. In essence, the Government insists that the thing mortgaged —— the Debtor's leasehold interest —— ceased to exist at the exact moment that, by virtue of confusion, the Lease ceased to exist, i.e., when the Debtor as lessee and mortgagor acquired the leased premises upon execution of the Deed and irrespective of the fact that the Deed was not filed in the conveyance records. It follows, asserts the Government, that its tax liens against the Debtor attached to the Foundry property at that precise instant, on September 5, 1989, when the Debtor again became owner of the formerly leased premises that it repurchased from the Parish. The Government concludes that, as the Mortgage was extinguished by operation of law, it (the Government) held the senior encumbrances on the Foundry, and was still holding them when, only days later, the Debtor's bankruptcy petition was filed.[11]

_____

[11] The Government also contends "in the alternative" that, regardless of the lease's continued existence, the Government is entitled to all of the Foundry sale proceeds because those proceeds derived from the sale of the tangible Foundry property and not from the sale of the Debtor's leasehold interest. As the Ross Group's security interest was limited to the Debtor's leasehold, asserts the Government, the Ross Group has no claim to the proceeds

12

### 3. The Ross Group's Position

The Ross Group first counters that, as the Louisiana public records doctrine specifies that unrecorded sales, contracts and judgments are ineffective as to third persons, the redemption sale of the Foundry from the Parish to the Debtor was ineffective as to the Ross Group because the Deed had never been registered in the Conveyance Records and remained unregistered on the date the bankruptcy petition was filed. Stated differently, the Ross Group's first argument is that as to third parties the confusion doctrine did not extinguish the leasehold, which the Mortgage encumbered, because, as to such parties, the Debtor did not acquire full and perfect ownership of the Foundry, which must include record title, until the Deed was registered — well after the bankruptcy petition was filed and the Ross Group's priority lien in the leasehold was rendered inextinguishable for all time.

Second, the Ross Group argues that, to any extent that the sale from the Parish to the Debtor extinguished the Lease by confusion, the sale and all of its legal effects were nevertheless void as to the Mortgage. This is so, insists the Ross Group, because (1) the purported lease termination by confusion directly

---

resulting from the sale of the Foundry.
        This, of course, is just another way of stating the Government's principal argument that the Mortgage itself was extinguished by virtue of the Lease's extinction under the doctrine of confusion. It suffices that the Government's persistent attempts — in its briefs and at oral argument — to dress its one substantive argument in various semantic robes has neither advanced its cause nor aided our understanding of the case.

violated § 11(l)(3) of the Mortgage, which proscribed such unilateral action of the Debtor without the prior written approval of the Ross Group, and (2) the Deed expressly acknowledges and provides for the continuing validity of the Mortgage.

Finally, the Ross Group also contends, in the alternative, that the Debtor had purchased certain machinery and equipment several years after the Foundry was constructed and leased and that this machinery and equipment, which was thus owned outright by the Debtor, was placed on the Foundry and was additionally subject to the Mortgage. Consequently, argues the Ross Group, this machinery and equipment remained encumbered by the Mortgage despite confusion of the Lease, and therefore, at a minimum, the proceeds of the sale of these items belong to the Ross Group.

### 4. The Bankruptcy Court's Decision

Rejecting the Ross Group's arguments, the bankruptcy court granted the Government's summary judgment motion. The court first reasoned that even though, under the Public Records Doctrine, the Deed was not effective against third parties, it was still effective "as between the parties" — the Parish and the Debtor — to transfer ownership (although not record title) to the Debtor. Relying next on the Civil Law doctrine of confusion, the bankruptcy court concluded that when the Debtor repurchased the Foundry from the Parish, the Lease between the Parish and the Debtor — and thus also the leasehold interest, which was the thing mortgaged — were extinguished by operation of law. Consequently, concluded the court, (1) the Lease was gone; (2) as a result, the Mortgage was

14

gone; (3) therefore, the Debtor owned the Foundry, unleased and free of the Mortgage, on the day the petition in bankruptcy was filed, even though the Debtor did not have <u>record</u> title to that property until approximately one year later; and (4) as the Debtor became the owner of the Foundry, free of the Lease and the Mortgage, at the instant the Deed was executed —— which was prior to the filing of the bankruptcy petition —— the Government's tax liens had attached to the Foundry and become the ranking encumbrances against it at that same instant, and so stood on the day that the bankruptcy petition was filed. Implicit in this determination is the proposition that the Debtor could not prevent recorded liens and judicial mortgages from attaching to property acquired by the Debtor merely by withholding its redemption deed from the conveyance records.

The bankruptcy court went on to reject the Ross Group's argument that the Deed's recognition of the continuing validity of the Mortgage prevented extinction of the Lease by confusion. The court concluded that such a contractual agreement constituted an impermissible derogation of "laws enacted for the public interest" or the "public good."

Finally, the bankruptcy court reasoned that if it were to assume <u>arguendo</u> that the sale of the Foundry was void pursuant to (1) § 11(l)(3) of the Mortgage, and (2) the statement to that effect in the Deed, then title to the Foundry would have remained in the <u>Parish</u> and would still have been there at the time the bankruptcy commenced. Had that been the case, concluded the court,

15

the Foundry would not have been the trustee's to sell. But, the court observed, any argument based on such a premise would be untimely now, as it would have to have been raised at the time the bankruptcy court approved the sale of the Foundry.[12] Given all these determinations, the bankruptcy court recognized the Government's otherwise junior federal tax liens as the senior encumbrances over the proceeds from the sale of the Foundry.[13]

The bankruptcy court did not address the Ross Group's alternative argument concerning the later purchased machinery and equipment. This is the equipment that the Ross Group contends remained encumbered by the Mortgage despite confusion of the Lease.

**5.    The District Court's Decision on Appeal**

In its appeal to the district court, the Ross Group re-asserted the arguments that it had advanced to the bankruptcy court and, for the first time in this action, also contended that the bankruptcy court had incorrectly allocated the sale proceeds between the Foundry and the Rolling Mill. The district court

---

[12] We note that the Ross Group <u>did</u> make an argument based on §11(l)(3) of the Mortgage at the sale application hearing before the bankruptcy court, but the court stated that it was not yet ready to rule on any arguments concerning the validity and relative rank of the Mortgage vis-à-vis the federal tax liens at that time. Indeed, that was the reason the bankruptcy court ordered proceeds of the sale of the Foundry to be held in escrow.

Notwithstanding the bankruptcy and district courts' erroneous conclusions of law on this argument, which we will address below, both the bankruptcy and district courts' holdings that any argument based on the actual terms of the Mortgage was foreclosed as untimely strikes us as puzzling to say the least.

[13] The bankruptcy court also determined that the Government's lien right was entitled to priority over the Debtor's other lien creditors, none of whom have appealed the bankruptcy court's judgment.

16

invited CPB, as the holder of the first mortgage on the Rolling Mill, to appear and address the allocation issue. CPB accepted the invitation and argued that the allocation issue had been raised and rejected by both the bankruptcy and district courts in their consideration of the Ross Group's objection to the trustee's application to sell the Foundry and the Rolling Mill in 1992, thereby rendering any present appeal of those decisions untimely and subject to a defense of estoppel.

In affirming, the district court essentially reiterated the bankruptcy court's holding that confusion had extinguished the Lease, and along with it the leasehold interest that was the thing mortgaged. Thus, concluded the district court, the Ross Group's encumbrance evaporated, preserving to the holder of the erstwhile Mortgage no interest whatsoever in the proceeds of the trustee's subsequent sale of the Foundry. The district court further agreed with the bankruptcy court that (1) the language contained in the Deed purporting to preserve the effect of the Mortgage, (2) the Debtor's covenant in the Mortgage not to surrender the leasehold or terminate or modify the Lease, and (3) the public records doctrine, were all ineffective to sustain a security interest for the Ross Group in the proceeds of the sale of the Foundry.

Finally, the district court stated that it need not address the Ross Group's contention that the bankruptcy court's allocation of the sale proceeds between the Foundry and the Rolling Mill was flawed. The district court observed that (1) it had already decided that the Ross Group did not have an interest in the

17

Foundry, and that the Government, which did, had not joined in the Ross Group's request for reallocation, and (2) the time for appealing the bankruptcy court's order authorizing the sale — and specifying how the sales proceeds were to be allocated — had long since passed.[14]

## II

## ANALYSIS

### A.    Standard of Review

As the parties note, we review a bankruptcy court's findings of fact under a clearly erroneous standard and decide issues of law de novo.[15]    In this appeal, the parties have not challenged the bankruptcy court's findings of fact; rather, they have focused their arguments solely on its conclusions of law.    Our review, therefore, is entirely plenary.

### B.    Extinguishing a Mortgage Under Louisiana Law

We begin our consideration of the continued validity and effectiveness of the Mortgage where we must — with the article of

---

[14]    The district court also rejected the Ross Group's alternative contention not addressed by the bankruptcy court, i.e., that the Mortgage encumbered machinery and equipment actually owned by the Debtor and never conveyed to and leased back from the Parish (at least as to those items purchased after the bond issue).    The court reasoned that (a) such movables were not legally susceptible of being encumbered by a collateral mortgage that was not also a collateral chattel mortgage, and (b) to the extent that these movables were deemed to be "immovable" by virtue of a "declaration of immobilization," that declaration was ineffective to subject the movables to the Mortgage.    This was so, according to the district court, because the declaration had not been executed until several months after execution and recordation of the Mortgage, which contained no after acquired property provision.

[15]    In re McDaniel, 70 F.3d. 841, 842-43 (5th Cir. 1995).

18

the Louisiana Civil Code that governs the extinction of mortgages. Former Article 3411 of the Louisiana Civil Code (1870) specified six ways by which mortgages are extinguished:

1. By the extinction of the thing mortgaged.
2. By the creditor acquiring the ownership of the thing mortgaged.
3. By the extinction of the mortgagor's right.
4. By the extinction of the debt, for which the mortgage was given.
5. By the creditor renouncing the mortgage.
6. By prescription.[16]

In this case, the parties have suggested ⸺ and we agree ⸺ that the first two methods listed in Article 3411 are the only ones among the six that could conceivably be applicable. We consider these two in inverse order.

### 1. Creditor's Acquiring Ownership of the Thing Mortgaged

The method outlined in Article 3411(2) provides that a mortgage is extinguished when the creditor, i.e., the mortga<u>gee</u>, acquires ownership of the thing mortgaged. As new Article 3319(2) makes clear,[17] this method of extinguishing a mortgage was designed

---

[16] La. Civ. Code art. 3411 (1870) (West 1972 Compiled Edition). As all the events pertinent to this appeal (the execution of the Lease, the execution and recordation of the Mortgage, the execution of the Deed, and the filing of the bankruptcy petition) occurred prior to January 1, 1993, the effective date of new Louisiana Civil Code Article 3319, which repealed and replaced Former Article 3411 (1870), we apply the former article in this case. As the Revision Comments to new Article 3411 explain, however, the new article reproduced the substance of the former article and only added one extra method of extinction, applicable to mortgages that secure future obligations (i.e., "a revolving line" of future indefinite obligations). <u>See</u> La. Civ. Code Ann. art. 3319 (West 1994). Thus our analysis would have been the same had we been applying new Article 3319 instead.

[17] New Article 3319 provides that "a mortgage is extinguished: (1) By the extinction or destruction of the thing

19

to apply to situations in which the Civil Law doctrine of "confusion" would operate to extinguish a mortgage. Despite the seemingly curious English translation of its French label, this traditional Civilian doctrine of the law of obligations is actually quite straightforward. As expressed in Louisiana Civil Code Article 1903, it simply means that "[when] the qualities of obligee and obligor are united in the same person, the obligation is extinguished."[18] In the specific context of mortgage — an accessory contract granted to provide security for the performance of the underlying or "principal" obligation — confusion will operate to extinguish the mortgage contract itself either (a) when confusion extinguishes the principal obligation, as when, for example, the promissory note that is secured by the mortgage is acquired by its maker, or (b) when confusion extinguishes the thing mortgaged, as when, for example, an encumbered building is acquired by the mortgagee.[19]

As the Ross Group correctly observes, the particular manifestation of confusion contemplated by Article 3411(2) could

---

mortgaged.
(2) By confusion as a result of the [mortgagee's] acquiring ownership of the thing mortgaged. . . .
La. Civ. Code Ann. art. 3319 (West 1994) (emphasis added).

[18] La. Civ. Code Ann. art. 1903 (West 1987).

[19] See Saul Litvinoff, The Law of Obligations, 5 Civil Law Treatise § 20.10, at 691 (1992); see also Dept. of Culture, Recreation & Tourism v. Fort McComb Development Corp., 385 So.2d 1233, 1235-36 (La. Ct. App. 4th Cir.), writ denied, 394 So.2d 613 (1980) ("In order for a mortgage to be extinguished by confusion, either the principal obligation securing it must be extinguished by confusion or the mortgaged property must be acquired by the mortgagee.") (emphasis added).

not operate here to extinguish the Mortgage: First, no one acquired the principal obligation from the Ross Group; and second, if anyone acquired "ownership" of the thing mortgaged (the leasehold interest), it was the Debtor (the mortgagor/obligor/debtor), not the Ross Group (the mortgagee/obligee/creditor). Regardless of whether or not the provisions of Article 3411(2) might have extinguished the Mortgage if the Debtor had acquired the hand note or if the Ross Group had acquired the Debtor's leasehold interest,[20] neither of those transactions occurred here. Consequently, we agree with the Ross Group that Article 3411(2) cannot provide a basis for finding that the Mortgage was extinguished by confusion.

## 2.   Extinction of the Thing Mortgaged

Former Article 3411(1) identifies the other potentially applicable method of extinguishing a mortgage: "extinction of the thing mortgaged."[21] The most recognizable example of this method of extinguishing a mortgage occurs when the thing mortgaged is uninsured corporeal (tangible) property — such as a building —

---

[20] Application of Article 3411(2) is well illustrated by the Fort McComb case. There, a development company granted a mortgage on its lessee's interest in a lease of an historic fort and simultaneously assigned the lease to the bank-mortgagee. When the lessor (the State) sought, inter alia, to cancel the mortgage of the leasehold interest on the theory that it was extinguished by the doctrine of confusion, the court held that the mortgage was not extinguished in this manner because the mortgagor's "assignment of the lease [to the bank] was not an act translative of title; it merely represented a security device in order to further secure the advance of money by the bank." 385 So.2d at 1236. Had there been, though, an act translative of title of the lessee's interest from the development company to the bank, confusion would have extinguished the Mortgage under Former Article 3411(2).

[21] La. Civ. Code Ann. art. 3411(1) (1870) (West 1972 Compiled Edition). The current counter part is new Article 3319(1).

21

and that thing is physically destroyed.[22]  Contrary to the Ross Group's protestations, this method of extinction is not limited in application to the physical destruction of corporeal things. Albeit relatively rare, an incorporeal ⸺ such as a leasehold interest ⸺ that (1) exists in the eyes of the law because it is "comprehended by the understanding,"[23] and (2) is the thing mortgaged, is susceptible not of destruction but of extinction, such as when it terminates by its express provisions, by the mutual consent of the parties, or by operation of law.

In this case, reacquisition of record title of the Foundry (the leased premises) by the Debtor (lessee) from the Parish (lessor), by virtue of their executing the Deed, had the potential of extinguishing the Lease by confusion and with it the Debtor's leasehold interest.  Under the doctrine of confusion "the qualities of obligee and obligor [were] united in the same person."[24]  Indeed, Louisiana law has long recognized that when the lessor's interest and the lessee's interest are consolidated in the same person ⸺ in this instance, the Debtor ⸺ the lease is extinguished by confusion.[25]  Regardless of the existence of any contractual

---

[22] See e.g., Coen v. Gobert, 154 So.2d 443, 445 (La. Ct. App. 2nd Cir. 1963) (destruction and removal of frame dwelling located on tract of land subject to mortgage extinguished mortgage on the dwelling under Article 3411(1)).

[23] La. Civ. Code Ann. art. 461 (West 1980).

[24] La. Civ. Code Ann. art. 1903 (West 1987).

[25] See Saul Litvinoff, The Law of Obligations, 5 Civil Law Treatise § 20.1, at 679 (1992) (citing Fernandez v. Soulie, 28 La. Ann. 311 (1876); Bartels & Dana v. Their Creditors, 11 La. Ann. 433 (1856)); see also Ranson v. Voiran, 146 So. 681, 682 (La. 1931).

agreements between the parties to the Deed or to the Mortgage that (1) would limit or vary the _effects_ of confusion on the parties' interests under the _Mortgage_, and (2) would not contravene public policy, the Debtor/Lessee's September 5, 1989, redemption of record title to the Foundry from the Parish/Lessor did in fact terminate the _Lease_, i.e., extinguish it, under the doctrine of confusion.  This does not end our inquiry though, for what remains to be seen is whether such extinction of the Debtor's leasehold interest, being the thing expressly encumbered in the Mortgage, must as a matter of public policy extinguish the Mortgage by confusion under former Article 3411(1) despite bona fide efforts of the parties to prevent that result.  Before we parse the Mortgage to see whether under the instant facts any of its provisions are effective to vary or limit the _effects_ of the doctrine of confusion without violating public policy, we take a short detour to analyze the effects of Louisiana's public records doctrine on this case.

## C.   Public Records Doctrine

The conclusion reached by both the bankruptcy court and the district court, that the public records doctrine does not preclude application of the confusion doctrine to extinguish the Lease under Article 3411(1), is correct —— _as far as it goes_.  Both courts accurately noted that Louisiana's public records doctrine, which has now been made statutory in Revised Statute § 9:2756, specifies that all unrecorded sales, contracts, and judgments affecting immovable property "shall be utterly null and void, _except between_

23

the parties thereto."[26]  It follows that even though the Deed, until filed for registry, would have been primed by a third party's subsequently executed but previously recorded conveyance or encumbrance, this unrecorded act was nonetheless capable of translating ownership (as distinct from record title) between the parties, i.e., the Debtor and the Parish, but only to the extent the Parish "owned" the Foundry (as distinct from holding record title to it) — assuming arguendo that ownership (as distinct from record title) had ever passed from the Debtor to the Parish in the first place.

As such, for purposes of confusion the Deed was, with respect to the obligations under the Lease, legally sufficient to consolidate — "confuse" — in the person of the Debtor the qualities of both obligee and obligor and thereby extinguish the Lease.[27]  Consequently, in the absence of operative facts or effective stipulations of the parties to the contrary, the public

---

[26] La. Rev. Stat. Ann. § 9:2756 (West. 1991) (emphasis added).

[27] In one illustrative case, a Louisiana court held that the execution of a dation en paiement from a mortgagor (Continental) to a mortgagee (Hibernia) extinguished two collateral mortgages under the doctrine of confusion, so as to allow a judicial mortgage filed in the interval between the execution of the dation and its recordation to create a lien on the immovable property that was the subject of the dation.  See Hibernia Nat'l Bank v. Continental Marble & Granite Co., 615 So.2d 1109 (La. Ct. App. 5th Cir. 1993).  Importantly, the court's holding hinged on its finding that "[a]s between the parties to an act effecting the transfer of an immovable, effectiveness of the transaction does not depend upon the act's recordation in the public records.  The law clearly provides that the transaction was complete and effective between the parties the moment it was executed . . .
. . . not the later moment of its recordation in the public records."  Id. at 1111 (emphasis added).

24

records doctrine could not prevent the Deed from effectively extinguishing the Lease —— and thus the Mortgage —— pursuant to Article 3411(1). This is so because the leasehold, as the thing mortgaged, ceased to exist the instant the Deed was executed —— assuming, of course, that nothing in the Mortgage or about the Lease transaction would vary the result supplied by Article 3411(1).

By the same token, the public records doctrine does, however, afford protection to the holder of the note secured by the Mortgage against third parties to the extent that this security device contains provisions proscribing unilateral acts of the mortgagor, whether or not in concert with third parties, to the prejudice of the mortgage. This doctrine likewise protects provisions of the Lease, such as extension and repurchase options, against intervening acts of third parties that might otherwise destroy the efficacy of such provisions.

**D.    Contractual Variations From Article 3411(1) —— Suppletive and Imperative Laws in the Louisiana Civil Code and the Pact de Non Alienando**

Up to this point, our analysis essentially replicates the principal thrust of the Government's argument as well as the conclusions of the bankruptcy and district courts: Execution of the Deed would directly extinguish the Lease by confusion, and indirectly extinguish the Mortgage by confusion. Where we depart is in our recognition that there could be something about the transaction or some enforceable stipulation, such as an after-acquired property clause, that might produce a different result.

Indeed, it is at precisely this point that the Government, the bankruptcy court, and the district court (1) misapprehended — and thus misapplied — an important principle of Civilian methodology and (2) overlooked basic features of Louisiana mortgage law, thereby producing reversible error. The methodology to which we refer is the one employed in classifying provisions of law as either "imperative" or "suppletive" and the role of public policy in achieving the proper classification. The "basic features" of mortgage law to which we refer are the pact de non alienando and its statutory counterpart, the anti-alienation rule as currently manifested in both Article 3307 of the Civil Code and Article 2701 of the Louisiana Code of Civil Procedure. And the reversible error to which we refer is the failure of those courts to (1) classify Article 3411(1) as merely suppletive, and (2) enforce the stipulations of the parties in the Mortgage. In short, the court erred in mischaracterizing and misconstruing the key anti-alienation stipulation in § 11(1)(3) of the contract between the Debtor and the Ross Group as the parties to the Mortgage, a stipulation obviously intended to limit, vary, or prohibit the results of transactions that would otherwise be governed by former Article 3341(1)'s rule that extinction of the thing mortgaged extinguishes the mortgage.

### 1. The Suppletive/Imperative Distinction

One tenet that is basic to every Civilian legal system is the distinction between "imperative" and "suppletive" laws. Former Article 11 of the Louisiana Civil Code (which was in effect when

26

the Mortgage was executed and recorded and the substance of which was not affected when in 1988 it and Article 12 were replaced by Article 7) expressed this distinction succinctly:

> Individuals cannot by their conventions, derogate from the form of laws made for the preservation of public order or good morals.

> But in all cases in which it is not expressly or impliedly prohibited, they can renounce what the law has established in their favor when the renunciation does not affect the rights of others, and is not contrary to the public good.[28]

Although neither former Article 11 nor its replacement employ the precise terms "imperative" or "suppletive," traditional civilian doctrine has, in the words of Professor Alejandro Garro, long characterized:

> as _imperative_ those legal precepts rooted in public policy which may not be set aside by private agreement. _Suppletive_ laws, on the other hand, are those legal norms designed to supplement the parties' will in cases wherein its application is not excluded.[29]

With this clear distinction in mind, then, we must ask whether former Article 3411(1)'s provision for the extinguishing of mortgages when the thing mortgaged ceases to exist is imperative or suppletive.

### 2. Enforcement of the Covenant as a Pact de Non Alienando

The task of distinguishing between suppletive and imperative laws is best approached, not in an abstract inquiry into

---

[28] La. Civ. Code Ann. Art. 11 (1870) (West 1972 Compiled Ed.); see also La. Civ. Code Ann. Art. 7 cmt. a (West 1993).

[29] Alejandro M. Garro, _Codification Technique and the Problem of Imperative and Suppletive Laws_, 41 La. L. Rev. 1007, 1008 (1981) (emphasis added).

the character of a particular provision in light of the elusive concepts of public order or the public interest, but, as Professor Garro instructs, by examining "the particular clause of the agreement which does away with a rule of law, and . . . ask[ing] whether the enforcement of the clause would be against public policy."[30]  When we follow this sage counsel in the instant case, we discover that enforcement of the Mortgage's covenant addressing the encumbering of a leasehold interest, as stipulated by the Debtor and the Ross Group, would <u>not</u> be violative of public policy. To the contrary, its terms are entirely consistent with Louisiana mortgage law and practice.[31]

We recall first that § 11(l)(3) of the Mortgage specifically provides:

> Mortgagor will not surrender any of its leasehold interests hereinabove described, nor terminate or cancel the Lease, and will not, without the prior written

---

[30] <u>Garro</u>, 41 La. L. Rev. at 1014.

[31] Both the bankruptcy and district courts did purport to apply Article 7's and former Article 11's implicit distinctions between imperative and suppletive laws, but did so in connection with the provisions of the <u>Deed</u> between the Debtor and <u>the Parish</u>, which attempted to recognize the continuing validity of the Mortgage, holding that this constituted an impermissible effort to derogate from an imperative law (public policy) because it affected the rights of others.  What those two courts failed to recognize, though, is that the only relevant application of the imperative/ suppletive dichotomy in this case is not to the Deed but to the <u>Mortgage</u>; specifically, its covenant that proscribes unilateral acts of the mortgagor to the prejudice of the Mortgage or the mortgagee.  This is so because the Mortgage is the only contractual agreement between the Ross Group and the Debtor; the <u>pact de non alienando</u> (the covenant at § 11(l)(3) of the Mortgage) sees to it that no act of the Debtor and the Parish subsequent to the execution and recordation of the Mortgage and the Lease can affect those of the mortgagee's rights that arise from any stipulation that does not contravene public policy.

consent of the Mortgagee modify, change, supplement, alter or amend the Lease, either orally or in writing, and any such termination, cancellation, modification, change, supplement, alteration or amendment of the lease without prior written consent of the Mortgagee shall be void and of no force and effect. As further security to the Mortgagee, Mortgagor does hereby deposit with the Mortgagee the original copy of the Lease and the Assignment thereof to be retained by the Mortgagee until all indebtedness secured hereby is fully paid.

By including this stipulation in the Mortgage, the Debtor as mortgagor expressly agreed not to take any action unilaterally that might terminate, cancel or modify the Lease or the Debtor's leasehold interest. Thus the Debtor agreed, <u>inter</u> <u>alia</u>, not to alienate or modify the property encumbered to secure the indebtedness owed to the holder of the collateral mortgage note in any way that would prejudice the Mortgage.[32] By proscribing such prejudicial actions of the mortgagor, the parties to the Mortgage were acknowledging between themselves — and, through the public records, were informing the rest of the world — that an action taken by the mortgagor in contravention of this covenant shall be of no effect vis-à-vis the Mortgage or the mortgagee. In this regard, the covenant is a specialized version of the venerable <u>pact de non alienando</u>,[33] or non-alienation clause, uniquely tailored here to fit the collateral mortgaging of a lessee's interest in a lease.

---

[32] <u>See</u> <u>Federal Land Bank of New Orleans v. Mulhern</u>, 157 So. 370 (La. 1934) (enforcing mortgage covenant requiring mortgagors not to deteriorate mortgaged property to the prejudice of the mortgage) and discussion infra at note 42 and accompanying text.

[33] For discussion of the <u>pact de non alienando</u>'s Spanish and early Louisiana origins, see Andrew Lane Plauche, <u>Comment, The Pact de Non Alienando in Louisiana</u>, 21 Tul. L. Rev. 238, 241 (1946), and <u>Citizens Bank of Louisiana v. Miller</u>, 10 So. 779, 780 (La. 1892).

In its earliest form, the <u>pact de non alienando</u> (or "pact de non") simply prohibited the mortgagor from selling, alienating, or encumbering the mortgaged property to the prejudice of the mortgagee or the creditor's mortgage.[34] Not an absolute contractual prohibition against sale,[35] however, this prototype pact de non primarily served as a procedural tool: It allowed a mortgage creditor to disregard a violation of the pact and proceed to foreclose <u>via executiva</u> on mortgaged property that had passed into the hands of a third party.[36] This in turn made unnecessary the preliminary step, in foreclosing <u>via ordinaria</u>, of first obtaining a judgment against the mortgagor and then naming the third party as a defendant in a subsequent suit. In short, the pact de non allowed the foreclosing mortgage creditor to ignore any transfers and encumbrances of the mortgaged property executed after recordation of the mortgage.

Ever since the Louisiana Supreme Court reaffirmed the validity of the pact de non in several early 19th century challenges to the device, reasoning that the sole basis for the effect of the clause derives from its mutual introduction by the parties into the mortgage contract,[37] Louisiana courts have consistently pointed to

---

[34] Michael D. Rubin, <u>Notice of Seizure in Mortgage Foreclosures and Tax Sale Proceedings: The Ramifications of Mennonite</u>, 48 La. L. Rev. 535, 545 (1988).

[35] <u>See</u> <u>Citizens Bank</u>, 10 So. at 780; <u>Freeman v. Ratcliff</u>, 162 So. 783, 785 (La. 1935).

[36] <u>Rubin</u>, 48 La. L. Rev. at 545.

[37] <u>Donaldson v. Maurin</u>, 1 La. 29, 40 (1830); <u>see also</u> <u>Nathan v. Lee</u>, 2 Mart. (N.S.) 32, 33 (La. 1823).

the pact de non when permitting mortgagees to foreclose directly on mortgaged property. This is permitted notwithstanding subsequent transfers or alienation, in a wide variety of contexts, including involuntary expropriations,[38] dissolution of marital communities,[39] insolvency,[40] and successions.[41] Some courts have also held that when the pact de non is carefully worded, it can serve as a contractual bar to certain activities and may even allow a mortgagee to foreclose on mortgaged property despite the mortgage payments being current.[42] Finally, we note that the Louisiana legislature enshrined the pact de non's protections for mortgagees, at least as far as sales or subsequent encumbrances of the mortgaged property are concerned, in Article 3397 of the Louisiana Civil Code of 1870 and in current Article 3307(2),[43] as well as in

---

[38] See Avengo v. Schmidt & Ziegler, 35 La. Ann. 585, 590 (1883), aff'd, 113 U.S. 293, 5 S.Ct. 487, 28 L.Ed.2d 976 (1885); Shields v. Shiff, 36 La. Ann. 644, 648 (1884), aff'd, 124 U.S. 351, 8 S.Ct. 510, 31 L.Ed.2d 445 (1888).

[39] See Slayton v. Swor, 165 So. 85, 86 (La. 1940); Spencer v. Collins, 338 So.2d 148 (La. Ct. App. 2nd Cir. 1976); Shifflet v. Brewer, 208 So.2d 31, 34 (La. Ct. App. 1st Cir. 1968).

[40] See W.W. Carre v. Int'l Car Co., 55 So. 9, 10-11 (La. 1911).

[41] See Bourgeois v. De Soto, 280 So.2d 271, 274 (La. Ct. App. 2nd Cir. 1972).

[42] See Federal Land Bank of New Orleans v. Mulhern, 157 So. 370, 373-74 (La. 1934); Harrelson v. Hogan, 451 So.2d 592, 596 (La. Ct. App. 2nd Cir. 1984).

[43] Former Article 3397 (1870) provides:
 1. That the debtor can not sell, engage, or mortgage the same property to other persons, to the prejudice of the mortgage which is already made to another creditor.
 2. That if the mortgaged thing goes out of the debtor's hands, the creditor may follow it in whatever hands it may have passed . . .

Article 2701 of the Louisiana Code of Civil Procedure.[44]

This brief history of judicial and statutory recognition of the pact de non in Louisiana law sets the stage for us to answer the crucial question whether enforcement of this particular covenant in the particular mortgage at issue under these particular circumstances would violate public policy. We answer this question in the negative.

Our threshold inquiry is whether the parties sought by their own stipulations to vary the results that would otherwise be "supplied" under Article 3411(1) if, but only if, the parties should fail to adopt a contrary contractual provision. Here, the covenant embodied in the Mortgage, prohibiting the Debtor from unilaterally canceling, terminating, or in any way modifying his leasehold interest to the prejudice of the Mortgage, is undeniably a pact de non. Moreover, this one is specifically tailored to recognize that the thing mortgaged is the lessee's interest in a

---

La. Civ. Code Ann. art. 3397 (1870) (West 1972 Compiled Ed.) Current Article 3307(2) replaced former Article 3397 in 1993 and provides simply: "The mortgaged property may not be transferred or encumbered to the prejudice of the mortgage." La. Civ. Code Ann. art. 3307(2) (West 1994).

[44] La. Code Civ. Proc. art. 2701 (West 1961) (providing statutory pact de non alienando and seeking to eliminate need for a conventional one). We also note, however, that in recent years constitutional due process considerations have lead courts and commentators to suggest that actual notice to third persons, including third possessors and holders of inferior mortgages, must be given before the property may be seized and sold pursuant to Louisiana's executory process scheme. See generally Rubin, 48 La. L. Rev. 535 (discussing ramifications of Mennonite Board of Missions v. Adams, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) and Bonner v. B-W Utilities, Inc., 452 F.Supp. 1295 (W.D. La. 1978)); and Patrick S. Ottinger, Enforcement of Real Mortgages by Executory Process, 51 La. L. Rev. 87, 106-08 (1990).

32

lease.  As such, its clear intent is to protect the mortgagee from any transactions unilaterally undertaken by the mortgagor with respect to the mortgaged leasehold interest that would prejudice the mortgagee's rights or the value or nature of its collateral. Just as clearly the parties intended results different from those that would be supplied by Article 3411(1) in the absence of a contractual provision.  So, the Mortgage's provision, <u>if not proscribed by public policy</u>, will trump Article 3411(1)'s suppletive rule that extinction of the thing mortgaged extinguishes the mortgage.

### 3.    Public Policy

Even if we were to grant arguendo that the extinguishing of a <u>lease</u> by confusion under Article 1903 somehow embodies public policy, we still would discern no embodiment of public policy in Article 3411(1)'s provision for extinguishing a <u>mortgage</u> when the thing mortgaged is destroyed or extinguished.  We hold therefore that under the instant circumstances enforcing the contractual covenant in such a manner that the <u>effects</u> of the Mortgage would continue to affect the Foundry (now, the proceeds of its sale) cannot be a violation of public policy; to the contrary, it is consistent with Louisiana's well established policy of favoring the pact de non's protection of a mortgagee's interests in collateral from the untoward effects of transactions undertaken by a mortgagor that would otherwise prejudice the mortgage or the thing that it encumbers.

To put it another way, our examination of the role of the pact

33

de non in Louisiana mortgage law in general and the subject covenant in the Mortgage in particular —— especially in the context of the financing arrangement which includes a merely pignorative transfer of record title coupled with a right of redemption,[45] all

---

[45] Louisiana law has long recognized that certain contracts of sale of immovable property containing a right of redemption and unaccompanied by delivery of the thing sold are merely pignorative contracts intended to secure the party borrowing funds (the vendor) not to transfer property onerously. See e.g., Marbury v. Colbert, 29 So. 871, 872 (La. 1901) (holding that "redeemable sales of immovable property, unaccompanied by delivery of the thing sold, will be considered, as between the parties, in the absence of evidence to the contrary, as mere contracts of security"); Latiolais v. Breaux, 98 So. 620, 621 (La. 1923)("[T]he one test by which to determine whether a contract evidences a real sale with a right of redemption [capable of transferring title], or a mere contract of security, . . . is whether the purchaser has gone into actual possession."); Ruffino v. Hunt, 99 So.2d 34, 37 (La. 1958) (applying rule in building and loan association industry wherein immovable property is sold to a homestead for cash and simultaneously resold by the homestead to its owner, thus serving to provide the homestead with the security of a vendor's lien and first mortgage, but not actually transferring title); Succession of Tucker, 449 So.2d 1020, 1022 (La. 1984) (same); Lerner Shops of Louisiana, Inc. v. Reeves, 73 So.2d 490, 495-97 (La. Ct. App. 1st Cir. 1954) (construing purported sale and leaseback of immovable property as a pignorative contract or security device when arrangement provided (1) the vendor with an option to repurchase the realty from the purchaser during the term of the lease and for the consideration paid by the purchaser and (2) the purchaser with the right to compel the vendor to repurchase the realty during the same period and for the same amount); Bagala v. Bagala, 110 So.2d 526, 529 (La. 1959) (finding pignorative contract in sale and resale situation outside homestead context); Jackson v. Golson, 91 So.2d 394, 399 (La. Ct. App. 2nd Cir. 1956) (same and containing thorough review of pertinent cases); In re Chase Manhattan Leasing Corp., 626 So.2d 433, 434 (La Ct. App. 4th Cir. 1993), writ denied, 630 So.2d 797 (La. 1994) (financed sale designed in form to appear as lease does not alter true nature of transaction).

The Ross Group has not stressed the pignorative nature of the sale and leaseback agreement between the Debtor and the Parish. Yet considering that the sale and leaseback was designed solely as a financing mechanism and contained a right of redemption, and that the Debtor never relinquished actual possession of the Foundry, the Ross Group could argue that the Debtor never in fact transferred ownership to the Parish to the degree necessary to extinguish the effects of the Mortgage when the Debtor redeemed the leased

34

of which is patently obvious from the provisions of the recorded instrument — convinces us that (1) Article 3411(1)'s provision for the extinguishing of mortgages when the thing mortgaged is extinguished or destroyed is merely <u>suppletive</u>, reflecting no identifiable public policy, and is thus susceptible of being subordinated by otherwise valid and non-absurd contractual variations that are in substance pacts de non, and (2) the particular covenant present here is fully susceptible of being enforced as a contractual alternative to Article 3411(1)'s suppletive provision without reaching any absurd result. Indeed, it is only the enforcement of this stipulation that avoids an absurd result, i.e., giving the Government an unintended windfall and saddling the Ross Group with an unintended "gotcha."[46]

This determination is reinforced by the realization that, in the context of Louisiana's public records doctrine, (1) both the Mortgage and the Lease were filed for record long before the subject tax liens were filed; (2) the <u>Mortgage</u> contained language expressly proscribing any prejudicial effects of unilateral

premises. Such an argument would lend support to the principal argument based on the pact de non which we have developed in this opinion.

[46] As noted above, other contractual variations that trump the provisions of Article 3411(1) are common place and taken for granted, e.g., provisions that call for replacement or substitution of collateral, and — especially — after-acquired property provisions. Were the results proscribed in Article 3411(1) reflective of public order, provisions in the agreement that direct substitution or replacement of collateral or attachment of the mortgage to property subsequently acquired by the mortgagor would be unenforceable. Recognizing the instant covenant also comports with Louisiana's policy favoring freedom of contract, which also supports the enforceability of these other provisions.

35

alienation by the lessee qua lessee; and (3) the Lease, containing inter alia both extension and repurchase (right of redemption) options in favor of the Debtor as lessee, all of which puts the world on notice that this is not a "true lease" situation but a pignorative arrangement under which only record title (but not ownership) is transferred.[47]  It follows inescapably that no third party, including the Government, is entitled to disregard the reasonably anticipated legal effects of any provisions of the Lease or the Mortgage, or their interplay with each other, once those documents were inscribed on the public records.

By merging or consolidating into the person of the Debtor the Parish's underlying precarious record title as nominal lessor with the Debtor's existing interest as lessee coupled with its right to redeem record title of the underlying leased premises, the repurchase retroactively re-vested the Debtor with full title to the Foundry property in the condition that such title existed when the Lease was first registered in the Conveyance Records of the Parish.  Thus, repurchase restored the Debtor's interest to that of full ownership, which it had held before making the pignorative transfer of record title to the Parish as the collateral aspect of the sale and leaseback bond financing arrangement.  The only result that would not be absurd, then, is that the Mortgage attached, ipso

---

[47] We take additional comfort in the fact that when the Louisiana legislature adopted Article 9 of the UCC, it recognized that a "financed lease" of movables (personalty), as opposed to a "true lease" of such property, would, as a pignorative contract, be subject to Louisiana's version of Article 9 governing security interests in movables.  See La. Rev. Stat. Ann. §§ 9:3309-3310.1 (West 1991).

_facto_, to the underlying property at the instant it was merged into or consolidated with the already-encumbered leasehold, _in the person of the Debtor_, by virtue of confusion. Without questioning that (1) the Lease was extinguished by confusion when the Deed was executed by the Parish, or (2) the Mortgage no longer encumbered just the leasehold rights of the Debtor as lessee when the Lease itself was extinguished by confusion, we nevertheless conclude that —— at precisely the same instant —— the Mortgage attached to and encumbered the Foundry property nunc pro tunc, with its title in the same condition as it had been when the Lease (and thus the repurchase option contained in the lease) was registered. In a nutshell, the Mortgage's expanded, particularized pact de non, coupled with the possession and redemption rights retained in the Lease, allowed the Mortgage to retain its rank senior to the liens of the Government and other junior encumbrances when the Debtor's re-acquisition of record title to the underlying Foundry property extinguished the Lease by confusion _into the person of the mortgagor_.

We speculate that we might not be here today if the Mortgage had coupled its pact de non with an express after-acquired property clause. Nevertheless, the law neither insists on perfection nor requires the uttering of talismanic words when, as here, it is gin clear from the four corners of the duly recorded documents —— the Lease and the Mortgage —— that re-consolidation of all facets of ownership, i.e., record title (the lessor's portion of those rights) and peaceable possession and enjoyment of fruits and

37

revenues (the lessee's portion of those rights), in the Debtor (the person of the current and future owner) never divested the debtor of those rights of possession and enjoyment. This re-consolidation occurred by operation of law (confusion) upon execution of the Deed in redemption of its record title by the Debtor pursuant to the re-purchase option. It follows that the Mortgage, by virtue of its covenants and provisions — that were no more violative of public policy than would have been an after-acquired property clause or a replacement or substitution of collateral provision — thereafter encumbered all rights of ownership to the same extent as it had always encumbered the possession, use, and enjoyment rights, via the leasehold, from its inception. We need not and therefore do not speculate on whether the same results would appertain had the transaction not been a pignorative arrangement or had confusion resulted in consolidation of ownership of the Foundry in a person other than a lessee/mortgagor.

4. **The Bankruptcy and District Courts' Treatment of the Mortgage's Pact de Non.**

Having said all this, we briefly address the bankruptcy and district courts' response to the Ross Group's arguments based on the Mortgage's anti-alienation covenant, i.e., the pact de non. Both courts held that this stipulation could only be given effect by finding that the Foundry continues to be owned by the Parish and never formed part of the Debtor's bankruptcy estate, making the trustee's sale of the Foundry a nullity. But, stated both courts, the Ross Group should have raised this argument prior to the trustee's sale of the Foundry, not subsequently as a basis for

38

claiming the proceeds of that sale. The district court also agreed with the Government's alternative position that even if the Debtor's reacquisition of the Foundry was a breach of the covenant, it only gave rise to an action against the Debtor and did not render the Deed void.

Both the bankruptcy and district courts' holdings on this issue miss the mark.[48] As the district court's brief alternative holding recognizes, a breach of a pact de non alienando, like the mortgage covenant at issue here, does not invalidate a transfer.[49] What it does do, however, — and what those courts failed to recognize — is alter the effects of the transfer: The covenant prevents a transfer that is prohibited by the pact de non from invalidating or prejudicing the creditor's mortgage.[50] In this

---

[48] As we noted above, the Ross Group did assert at the sale application hearing before the bankruptcy court that, inter alia, the seniority of its Mortgage was protected by the pact de non alienando, but the court responded that at the time it was not yet ready to rule on any arguments concerning the validity and relative ranking of the Mortgage. Thus, the two courts' holdings that any argument based on the actual terms of the Mortgage was foreclosed cannot stand.

[49] See Freedman v. Ratcliff, 162 So. 783, 785 (La. 1935) ("The pact de non alienando does not prevent the mortgagor from selling the property, subject to the mortgage, but gives the mortgagee the right to ignore a sale of the mortgaged property and to proceed only against the mortgagor"); Miller, 10 So. at 780 (quoting Ducros v. Fortin, 8 Rob. 164 (La. 1844)) (noting that the pact de non "does not absolutely prevent a sale of the property by the mortgagor. The latter may transfer the property, subject to the right which such a clause gives the mortgagee of proceeding summarily against it, as if it still belonged to the mortgagor").

[50] See First National Bank of Shreveport v. Houseman, 160 So. 618, 620 (La. 1935) (citing Maisonneuve v. Martin, 99 So. 704 (La. 1924)) ("The pact de non alienando in a recorded act of mortgage makes a subsequent mortgage or other disposition of the property ipso jure void so far as the original mortgagee and his assigns are

39

instance, the covenant "supplied" by the parties to the Mortgage allows the Mortgage to (1) survive the mortgagor's acts that would unilaterally extinguish the Lease by confusion to the benefit of the mortgagor, i.e., the Debtor's acquisition of the underlying property by exercise of its repurchase option, and (2) continue as an encumbrance on the Foundry as the underlying property that gave rise to the leasehold interest in the first place (more accurately now, to the proceeds of the trustee's sale of that property).

**D. The Allocation Issue and the Ross Group's Alternative Argument**

On appeal the Ross Group continues to protest the way that the proceeds of the trustee's sales between the Foundry and the Rolling Mill were allocated.  Even though we reverse the bankruptcy and district courts' determinations that the Ross Group has no interest in the proceeds of the sale of the Foundry and hold instead that the Ross Group's security right in the leasehold interest followed it into the full ownership of the leased premises when those interests were merged by confusion into ownership in the person of the Debtor as mortgagor, we nevertheless agree with those courts and with CPB that the Ross Group's present challenge to the bankruptcy court's allocation of the proceeds of the trustee's sale must fail.

First, and most importantly, the Ross Group sought essentially identical relief on these very allocation issues in its objections at the October 1992 sale authorization hearing, and in its unsuccessful district court appeal of the bankruptcy court's sale

concerned.") (emphasis added).

40

order. Accordingly, its present claims on these issues are precluded under the doctrines of res judicata[51] and collateral estoppel.[52] Furthermore, under Bankruptcy Rule 8002, these claims are untimely as appeals of the 1992 sale order.[53] Therefore, the rulings of the bankruptcy and district courts on the allocation issues will not be addressed here, and the Ross Group's complaints in that regard are dismissed.

Second, we note that the Ross Group's alternative argument ⸺ that the leasehold collateral mortgage encumbered assets other than the leasehold ⸺ is moot. We have already determined that the Mortgage encumbered the Foundry itself and provides the Ross Group with the senior lien over the proceeds of the trustee's _in globo_ sale of that property.

## III

## CONCLUSION

We do not disturb the bankruptcy court's allocation of the sales proceeds between the Foundry and the Rolling Mill. Concluding, however, that the effects of the Mortgage were not

---

[51] _Eubanks v. FDIC_, 977 F.2d 166, 170 (5th Cir. 1992) (assuming other requirements of res judicata are met, a prior judgment may bar a subsequent action brought even by a person who was not a party to the original litigation when the non-party's interests are closely aligned with and adequately represented by a party to the prior action).

[52] _Recoveredge L.P. v. Pentecost_, 44 F.3d 1284, 1290 (5th Cir. 1995).

[53] Bankruptcy Rule 8002(a) provides a 10 day time period for filing notice of appeal. As the sale allocation between the foundry and the rolling was made in the bankruptcy court's October 9, 1992 Sale Order, the Ross Group's belated attempts to re-litigate the allocation issue are clearly untimely.

extinguished when the Lease was extinguished by confusion upon the Debtor's pre-petition redemption of record title to the Foundry property, we reverse the judgment of the bankruptcy court, as affirmed by the district court, that awarded the proceeds of the sale of the Foundry to the Government.  We therefore render judgment in favor of the Ross Group, recognizing its entitlement to the proceeds of the trustee's sale of the Foundry, and remand this matter to the bankruptcy court for further proceedings consistent with this opinion.

AFFIRMED in part; REVERSED and RENDERED in part; and REMANDED with instructions.