# In the
# United States Court of Appeals
## For the Seventh Circuit

—————————

No. 05-1697

IN RE:

    COMDISCO, INC.,

                                           *Debtor.*

APPEAL OF:

    DOWNEY SAVINGS AND LOAN ASSOCIATION, F.A.

—————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6280—**George W. Lindberg**, *Judge.*

—————————

ARGUED DECEMBER 5, 2005—DECIDED JANUARY 17, 2006

—————————

Before POSNER, KANNE, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* Comdisco, now in bankruptcy, had a contract with Downey, which Downey alleged Comdisco had broken. After a trial, the bankruptcy judge decided there had been no breach. The district court affirmed, and Downey appeals. The issue is the interpretation of a sale and leaseback arrangement intended by Downey to generate a considerable tax savings for it. Both the sale and the lease specify that Illinois law is to govern any dispute arising from the contracts.

Comdisco, a large dealer in IBM mainframe computers, sold $46 million worth of these computers to Downey, which in turn leased them back to Comdisco for five years; Comdisco in turn subleased them to its customers. Downey is not in the computer business—it is a savings and loan association—but it happened to have large loss carryforwards from which it sought to reap a cash benefit by using them to offset taxable income. The problem was that the loss carryforwards were about to expire. So the parties arranged that simultaneously with the sale of the computers to Downey and their lease back to Comdisco, Comdisco would pay Downey a sum equal to the discounted present value of the annual rentals specified in the lease. This enabled Downey to report the entire amount as taxable income in the year received but to use the loss carryforwards to wipe out the tax due on the amount. There was no net tax benefit—not yet, anyway—because the loss carryforwards merely offset taxable income that Downey would not have had but for the lease. But as the owner of the computers Downey was entitled to depreciate them over their useful life, and the depreciation expense thus calculated could be used to offset taxable income received by Downey during that five-year period, thus generating a net tax benefit. The loss carryforwards could not have been applied directly to future income because they were about to expire. The sale and leaseback enabled them to be used indirectly to reduce future income tax.

However, for the sale and leaseback to accomplish this "NOL soak-out" (that is, for it to soak up net operating losses with taxable income so that the losses would generate a tax benefit), the transaction had to have a business rationale besides just beating taxes. A transaction that would make no commercial sense were it not for the opportunity to beat taxes would be deemed a sham by the

Internal Revenue Service. The general principle ("substance over form") is illustrated by *Gregory v. Helvering*, 293 U.S. 465, 468-70 (1935), and *Yosha v. Commissioner*, 861 F.2d 494, 495-98 (7th Cir. 1988), and its application to sale and leaseback arrangements by *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84 (1978); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91-95 (4th Cir. 1985), and *Mukerji v. Commissioner*, 87 T.C. 926, 957-62 (1986).

To avoid this fate, the transaction had, at a minimum, to satisfy two conditions: Downey could not pay more for the computers than their market price (this condition is conceded to have been satisfied), and had to have a reasonable prospect of obtaining a profit, over and above any tax savings, from the deal. If the price it paid for the computers was just equal to the present value of the lease and the computers would have no value at the end of the five years, when Downey would be free to sell them or release them, there would be no profit for Downey and so the sale and leaseback would be deemed a sham. The sum of the present value of the lease and the present value of the reasonably forecast residual value of the computers had to exceed the price paid by Downey for the computers; otherwise Downey had no expectation of making a profit.

It might seem that if Downey could expect to make a profit from the transaction Comdisco would expect to incur a loss and therefore the transaction must have been a commercial chimera after all, regardless of residual value. Not necessarily. Provided that the present value of the lease (what Comdisco paid Downey) was less than the purchase price (what Downey paid Comdisco), Comdisco would be receiving a net cash payment; and in that event the sale and leaseback arrangement might be defensible as a method of financing, equivalent to a loan (specifically, as we are about to explain, a nonrecourse loan) to the seller-lessee,

Comdisco. *Public Hospital of Town of Salem v. Shalala* 83 F.3d 175, 178 (7th Cir. 1996); *In re Secured Equipment Trust of Eastern Air Lines, Inc.*, 38 F.3d 86, 87 (2d Cir. 1994); *In re Dibert, Bancroft & Ross Co.*, 117 F.3d 160, 177 (5th Cir. 1997).

"Might," not "would"; and recall our earlier qualification: "at a minimum." It is uncertain whether the transaction had any purpose other than to create a tax saving for Downey that it agreed to share with Comdisco to induce the latter to participate. The transaction was the equivalent (for all but tax purposes) of a nonrecourse loan, which is to say a loan in which the lender can look only to the collateral (the computers) for repayment; the borrower has no personal obligation to repay. The loan here was, as we said, the difference between the price that Downey paid for the computers and the upfront lease payment by Comdisco. The only way in which the sale contract and lease permitted Downey to recover the loan at the end of the five-year lease was by Downey's selling (or conceivably re-leasing) the computers at that time, when it would be free to do so. This meant that the risk of fluctuations in the market value of the computers was borne by Downey, even though Downey was not in the computer business and Comdisco was. Downey's only motive for the transaction may have been to save taxes, and Comdisco's only motive to be paid a share of the savings.

We cannot be certain of this; maybe Downey specializes in making loans secured by computers and holds a diversified portfolio of such loans that dampens the effect of fluctuations in the market value of particular computers, cf. W. P. Carey & Co. LLC, *Hoover's In-Depth Company Records* (Dec. 21, 2005), though there is no suggestion of these things in the record. As long as there was *some* nontax business rationale for the transaction, the fact that tax considerations figured prominently in the motivation for the transaction

would not be fatal. *United Parcel Service of America, Inc. v. Commissioner*, 254 F.3d 1014, 1019-20 (11th Cir. 2001). At all events, whether the Internal Revenue Service would have questioned the transaction regardless of the residual value of the computers the parties have not said and we do not know. All that matters for this appeal is the Service's insistence that in an NOL soak-out the forecast of the residual value of the leased equipment at the expiration of the lease must not be unreasonably generous. *Coleman v. Commissioner*, 16 F.3d 821, 824-25 (7th Cir. 1994); *Gilman v. Commissioner*, 933 F.2d 143, 148-49 (2d Cir. 1991); *Rice's Toyota World, Inc. v. Commissioner*, *supra*, 752 F.2d at 92-93.

The Service is concerned with an inflated forecast because the lower the residual value is expected to be, the likelier the transaction is to be a sham. To illustrate, suppose the purchase price in the sale part of the sale and leaseback arrangement is 100 and the forecasted residual value (discounted to present value) of the purchased property is 30. Then the present value of the lease would be 70, and it would be easy to see how the sale and leaseback could indeed be a method of financing the lessee, since he would be receiving the purchase price of 100, immediately paying 70 back to the lessor, and thus retaining 30 to finance his other operations. But suppose that the expected residual value of the leased equipment is not 30 but 5, so that all the lessee receives is a "loan" of 5. The suspicion of a sham transaction is now strong; and in fact the IRS insists that, at least for purposes of the taxpayer's obtaining advance clearance of the transaction, the forecasted residual value be at least 20 percent of the purchase price. IRS Rev. Proc. 2001-28 § 4.01(3).

Marshall & Stevens, a nationwide valuation firm, was asked, probably by Comdisco although the bankruptcy

court made no finding, to forecast the residual value of the computers that Comdisco was selling to Downey. M&S forecast that the computers would be worth $9 million upon the expiration of the lease—a shade under the IRS's 20 percent benchmark but close enough to make a challenge by the Service unlikely on the basis of the benchmark (for remember that it's what the taxpayer must show to get advance clearance), provided that the forecast was reasonable. So the deal closed.

That was in 1990. In 1995 the lease expired and Downey was revested with the computers. Their market value, it turned out, was so much lower than $9 million—it was a paltry $200,000—that the IRS became suspicious. Eventually it determined that the sale and leaseback transaction had been largely though not entirely a sham, and denied about half of the tax benefit that Downey had sought, and as a result Downey owed $7.8 million in additional taxes.

Downey does not deny that it owes the additional taxes, but it says that the fault is Comdisco's and so Comdisco should reimburse it for them. Downey owes the additional taxes not because the market value of the computers in 1995 was much less than the 1990 forecast by M&S but because the IRS concluded that that forecast had been irresponsible. Downey argues that the sale and lease contracts made Comdisco responsible for the appraiser's negligence in preparing an appraisal that the IRS would not accept. Yet Downey has not sued M&S, even though Comdisco is in bankruptcy and the appraisal firm is not. It is true that the firm had no direct contractual relation with Downey and that its appraisal report disclaims any warranty of its forecast. But Downey might have been expected to depict itself as a third-party beneficiary of the contract between Comdisco and M&S, assuming that, as Downey contends,

Comdisco had retained the latter to prepare the appraisal, or to argue that M&S had a tort duty of care toward Downey because it knew that Downey would rely on the report. And while M&S disclaimed any warranty of the value estimated in its report, it did not disclaim a duty of due care in arriving at the estimation. However, for whatever reason, Downey is seeking relief only against Comdisco, and we express no view on whether it might have had a good claim against the appraiser.

Downey relies on a provision of the lease which states that "the inaccuracy in any material respect of any representation or warranty made by [Comdisco] herein [i.e., in the lease] or in the Equipment Purchase Agreement [the sale part of the sale and leaseback arrangement] or any document or certificate furnished by [Comdisco] in connection herewith or therewith" is a breach. We assume that M&S's appraisal report was among the documents furnished by Comdisco to Downey. But that document does not contain any representation or warranty *made by Comdisco*. Indeed, for Comdisco to have inserted its own representations into the report would have endangered the tax-shelter aspect of the transaction; the IRS is more likely to accept a residual valuation done by an independent appraiser than one done by the tax-shelter promoter himself. See *Casebeer v. Commissioner*, 909 F.2d 1360, 1364 (9th Cir. 1990); *Estate of True v. Commissioner*, 390 F.3d 1210, 1221-22 (10th Cir. 2004); *Pearlstein v. Commissioner*, T.C. Memo. 1989-621 (1989).

Contractual language can be bent when necessary to avoid absurd or even just commercially unreasonable results. *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 860 (7th Cir. 2002); *Merheb v. Illinois State Toll Highway Authority*, 267 F.3d 710, 713 (7th Cir. 2001); *Health Professionals, Ltd. v. Johnson*, 791 N.E.2d 1179, 1193 (Ill. App. 2003). But the literal

reading happens in this case to be the reasonable one. Given the difficulty of forecasting the value of a computer five years in the future, a tax-shelter promoter (which seems a reasonable characterization of Comdisco's role in the transaction) would be reluctant to assume responsibility for an error by an independent appraiser. Of course Downey is asking only that Comdisco be held legally responsible for a *negligent* error—not that it be held liable for a forecast that just happens to turn out to be erroneous. But were this the rule it would require Comdisco, for reasons of self-protection, to involve itself in the appraisal—to look over M&S's shoulder in order to make sure that the appraiser was using methods that would not get Comdisco into trouble—and this second-guessing would compromise the appraiser's independence and thus endanger the tax objective of the sale and leaseback. It would also expose the tax-shelter promoter to a high probability of being sued, as the disappointed taxpayer would look for every possible ground on which to shift its loss of anticipated tax benefits to the promoter.

Not only was the case correctly resolved; it should not even have been tried. In general, as we noted in *Bank of America, N.A. v. Moglia*, 330 F.3d 942, 946 (7th Cir. 2003) (Illinois law), issues of interpretation in contract cases should be resolved on the basis of the contract's language in order to minimize the costs and uncertainties of enforcing contracts. Only if the language is unclear and cannot be disambiguated without reference to facts that can be determined only by means of a trial, or if there is some compelling reason to think that the language though clear is so only because critical contextual factors have been ignored, is there any reason to burden the parties with a trial on the meaning of the contract. Neither condition was satisfied here. The contract does not purport

to make Comdisco responsible for errors negligent or otherwise by the appraiser, and there is nothing in the surrounding circumstances to suggest that such a term should be interpolated in order to avoid an interpretation that would make no commercial sense.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*