In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 09-3079, 09-3177

IN RE:

SOUTH BEACH SECURITIES, INC.,

*Debtor.*

APPEAL OF:

SCATTERED CORPORATION, INC., AND
SOUTH BEACH SECURITIES, INC.,

*Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 1135—**Joan Humphrey Lefkow**, *Judge*.

ARGUED FEBRUARY 19, 2010—DECIDED MAY 19, 2010

Before POSNER, FLAUM, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. A corporation called South Beach Securities filed a petition under Chapter 11 of the Bankruptcy Code and submitted a plan of reorganization. The bankruptcy judge refused to confirm the plan and dismissed the bankruptcy proceeding. *In re South Beach Securities, Inc.*, 376 B.R. 881 (Bankr. N.D. Ill. 2007). South

Beach and its only creditor, Scattered Corporation, appealed to the district court, which affirmed. 421 B.R. 456 (N.D. Ill. 2009). Scattered and South Beach now appeal to us but South Beach has adopted Scattered's brief and makes no separate arguments.

Led by Leon A. Greenblatt III—a "character" if ever there was one, see Gary Washburn & Kim Barker, "Randolph Tower Running Up a Tab: City Says Owner Faces a Hefty Bill," *Chicago Tribune*, Mar. 20, 2001, p. 1; Greg Burns, "Scattered's Chief Buoyed by SEC Victory: Greenblatt Pursues Suit Against Chicago Exchange," *Chicago Tribune*, Nov. 15, 1998, p. 1; Burns, "The 'Bad Boys' of Chicago Arbitrage," *Business Week Archives*, Aug. 5, 1996, www.businessweek.com/1996/32/b34876.htm (visited Feb. 19, 2010)—Scattered achieved notoriety some years ago by selling short more shares of LTV than existed. We held that this tactic did *not* violate the securities laws. *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995). But the Chicago Stock Exchange, of which Scattered was a member, took a dimmer view of Scattered's conduct, accusing it of fraud and precipitating litigation eventually resolved in the company's favor but not before it had been driven out of the securities business. *In re Scattered Corp.*, 53 S.E.C. 948 (1998); "Scattered Corp. Finally Ends Its Long Battle with CHX with Settlement Vindicating Firm's Position," *Securities Week*, Apr. 19, 1999; "Scattered Sells CHX Seat and Exits Securities Industry," *Securities Week*, Dec. 8, 1997; "SEC Grants Scattered Partial Stay in CHX Finding of Firm's Fraud and Manipulation," *Securities Week*, May 19, 1997. What it does now is unclear.

South Beach, the debtor in the bankruptcy proceeding, also is controlled by Greenblatt. It is not participating actively in this appeal (it has merely, as we said, adopted Scattered's brief), but the U.S. Trustee—a Department of Justice official whose role is to be a watchdog in bankruptcy proceedings, 28 U.S.C. § 586(a)(3)—is. He opposed the confirmation of the plan of reorganization in the bankruptcy court and the district court and defends their rulings in this court. He argues that the only purpose of South Beach's declaration of bankruptcy, and of the plan of reorganization, is to avoid taxes, and a plan of reorganization cannot be confirmed "if the principal purpose of the plan is the avoidance of taxes." 11 U.S.C. § 1129(d). The U.S. Trustee's role was especially important in this case because the bankruptcy was nonadversarial, and, indeed, as we shall see, phony. Were it not for his participation, Scattered would have no opponent in this court.

Scattered argues that the U.S. Trustee is not authorized to object to a plan of reorganization on the ground that the plan's primary purpose is to avoid taxes. And indeed it is not obvious that the U.S. Trustee's writ runs to policing against tax evasion—one might think the proper watchdog would be the Internal Revenue Service, which could have objected to confirmation of the plan at the outset, or could step in later by invoking section 269 of the tax code (discussed below) when and if a party to the bankruptcy proceeding claimed a tax benefit. 26 C.F.R. § 1.269-3(e). And there are objections based on the text of the Bankruptcy Code to the U.S. Trustee's playing the role of tax watchdog in bankruptcy proceedings, though not compelling objections.

The Code permits only a "party in interest that is a governmental unit" to oppose a plan of reorganization on the ground that the plan's primary purpose is to beat taxes. 11 U.S.C. § 1129(d); *In re Trans Max Technologies, Inc.*, 349 B.R. 80, 91 (Bankr. D. Nev. 2006); 7 *Collier on Bankruptcy* ¶ 1129.07, p. 1129-176 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009). A U.S. Trustee is deemed not to be "a governmental unit" only "while serving as a trustee in a" bankruptcy case. 11 U.S.C. § 101(27). The U.S. Trustee is not the trustee in bankruptcy in this case. There is no trustee; South Beach is a debtor in possession. The Ninth Circuit has ruled, however, that the U.S. Trustee can *never* be "a governmental unit," even when not serving as a trustee in bankruptcy. *Balser v. Department of Justice*, 327 F.3d 903, 908 (9th Cir. 2003). In so ruling, the court overlooked section 101(27) of the Bankruptcy Code, the section we just quoted that makes clear that the U.S. Trustee is not a governmental unit only when he is acting as a trustee in bankruptcy. *Balser* was not actually addressing the question whether the U.S. Trustee is authorized by 11 U.S.C. § 1129(d) to participate in a bankruptcy. Yet *In re Trans Max Technologies, Inc.*, *supra*, 349 B.R. at 91, relied on *Balser* to conclude that the U.S. Trustee was not authorized—while questioning the oversight that had led the Ninth Circuit to that erroneous conclusion. *Id*. at 91 n. 12.

But there is another ground on which to question the U.S. Trustee's authority to challenge the plan of reorganization. Remember that only a "*party in interest* that is a governmental unit" (emphasis added) can object to a plan on tax grounds. Now it is true that the term "party in

interest" is defined nonexclusively as "*including* the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee." 11 U.S.C. § 1109(b) (emphasis added). The U.S. Trustee is not excluded. And anyway "all this section means is that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains." *In re James Wilson Associates*, 965 F.2d 160, 169 (7th Cir. 1992). This implies that the U.S. Trustee can be a "party in interest" when he seeks to protect the rules and procedures of bankruptcy, over which he is the congressionally ordained watchdog—he has a statutory interest in making sure that bankruptcy law isn't abused.

But elsewhere in the Code "party in interest" and "United States trustee" are treated disjunctively. See, e.g., 11 U.S.C. § 707(b)(1) ("after notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee . . . or any party in interest . . ."); *id.*, § 1104 ("on request of a party in interest or the United States trustee"). Yet when we turn to section 307 of the Code we discover that "the United States trustee may raise and may appear and be heard on any issue in any case or proceeding under this title." This language, exactly parallel to the authority granted parties in interest by section 1109(b) ("a party in interest . . . may raise and may appear and be heard on any issue in a case under this chapter"), suggests that the U.S. Trustee can object to a plan of reorganization after all, in his role as guardian of

the public interest in bankruptcy proceedings. See, e.g. *In re United Artists Theatre Co.*, 315 F.3d 217, 225 (3d Cir. 2003). The public has an interest in limiting the use of bankruptcy to the purposes for which it is intended rather than permitting it to be used as a vehicle by which solvent firms can beat taxes. Courts often have deemed the U.S. Trustee to be a "party in interest" in related contexts. E.g., *In re A-1 Trash Pickup, Inc.*, 802 F.2d 774 (4th Cir. 1986) (moving for conversion or dismissal of Chapter 11 case); *In re Miles*, 330 B.R. 848, 849-51 (Bankr. M.D. Ga. 2004) (moving for dismissal or transfer of case because of improper venue).

The statute is a mishmash but the view that the U.S. Trustee can be a party in interest makes better sense, as this case illustrates; we'll see that the case *really* needed a watchdog, and we cannot see what would be gained by everyone having to wait for the Internal Revenue Service to take action against Greenblatt's tax shenanigans. The IRS did receive a copy of the plan and didn't object to it, but may have thought that since it could always disallow the deductions later if the plan got confirmed and since it isn't in the business of preventing abuse of bankruptcy per se, there was no need for it to intervene in the bankruptcy.

And even if the U.S. Trustee was not a party in interest, the bankruptcy or district court, since it can hardly be thought *required* to approve an unlawful plan of reorganization, need not turn a deaf ear when the U.S. Trustee, or anyone else for that matter, argues the plan's unlawfulness. If in doing so the U.S. Trustee is acting *ultra vires*, as we very much doubt, his superiors in the Justice

Department can rein him in; but even if he should be thought an officious intermeddler, this would not authorize Scattered to flout bankruptcy law. Congress has authorized the federal courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title [the Bankruptcy Code]," and, even more pointedly, has declared that "no provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). Consistent with this language, bankruptcy judges have considered issues of tax avoidance on their own initiative. *In re Hartman Material Handling Systems, Inc.*, 141 B.R. 802, 808-09 and n. 10 (Bankr. S.D.N.Y. 1992); *In re Maxim Industries, Inc.*, 22 B.R. 611 (Bankr. D. Mass. 1982); cf. *In re Economy Cast Stone Co.*, 16 B.R. 647, 650 (Bankr. E.D. Va. 1981). As *Hartman* explained, "this Court cannot fairly consider plan confirmation . . . and ignore the obvious tax avoidance question. Congress has given the bankruptcy courts the responsibility for determining whether a reorganization plan is proper, including tax considerations." 141 B.R. at 809.

And given the breadth of the statutory definition of "party in interest," how can the U.S. Trustee have standing to make motions and be heard in bankruptcy cases (as he is expressly authorized to do, 11 U.S.C. §§ 307, 707(b)(1)) if he has no "interest" in such cases? We conclude that he is a party in interest, and come at last to the merits of the appeal.

South Beach was once a registered securities bro-ker/dealer, but by the time it declared bankruptcy it had become a shell. It had no employees or business activities, and its only "assets" were net operating losses. These are better described as *potential* assets, because they can sometimes, but by no means always, as we're about to see, be set off against taxable income and thus reduce a company's taxes. 26 U.S.C. § 172; *United Dominion Indus-tries, Inc. v. United States*, 532 U.S. 822, 825 (2001); *In re Comdisco, Inc.*, 434 F.3d 963, 965 (7th Cir. 2006); *In re Harvard Industries, Inc.*, 568 F.3d 444, 445-46 n. 2 (3d Cir. 2009); 1 Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations and Shareholders*, ¶ 5.03[4], p. 5-17 (7th ed. 2009). We don't know how South Beach came to have these losses; its only recent activity was preparing its bankruptcy filing.

South Beach is wholly owned by NOLA, LLC, which has no business operations either; its sole asset is the stock of South Beach. NOLA, a limited liability company, has three members. One is Greenblatt's father; the others are the fathers of Scattered's other two officers and direc-tors. NOLA is managed by a company named Teletech whose president and sole employee at the relevant time was Greenblatt and whose sole function is to manage NOLA. Through Teletech, and thus through NOLA, Greenblatt controls South Beach.

In 2001 Greenblatt directed another corporation that he controls, Loop Corporation, to lend South Beach $2.2 million for five years at an annual interest rate of 12 percent. He then had South Beach lend NOLA

$3.2 million. The purpose of the loan to NOLA was to enable it to purchase the stock of a company called Health Risk Management, Inc (HRM). We do not know where South Beach obtained $1 million to make up the difference between the $2.2 million that it received from Loop and the $3.2 million that it lent to NOLA. It may have had assets left over from its time as a broker/dealer; as we said, it has no assets now other than net operating losses.

Loop then sold to Scattered, for $100,000, the $2.2 million loan that it had made to South Beach. This made Scattered a creditor of South Beach, because South Beach was Loop's debtor and now Scattered had stepped into Loop's shoes. Scattered claims to be owed $3.3 million by South Beach, though it has not explained why the $2.2 million loan that it bought from Loop should give it a $3.3 million claim against South Beach, the debtor on that loan; conceivably the explanation is the high interest rate.

Greenblatt is an officer and director of Scattered, along with the sons of NOLA's other owners, and it appears that he negotiated all the transactions relating to this case both with and on behalf of South Beach. He also signed South Beach's Chapter 11 petition. All the companies that we have mentioned except HRM have the same office address. It is apparent that Greenblatt caused Scattered to become South Beach's creditor and caused South Beach to declare bankruptcy.

South Beach's bankruptcy filings list, as its sole asset, the stock in HRM, and assign to that stock a value of zero.

How South Beach ended up with HRM's stock, which it had lent NOLA the money to buy, is unexplained, but it confirms the obvious: all these companies are controlled by Greenblatt.

NOLA, having used the money it borrowed from South Beach to buy stock in HRM that became worthless, and having no other assets, went broke too, just like South Beach. Its bankruptcy proceeding began at the same time as South Beach's, but is not before us.

South Beach did not list its net operating losses as an asset. But its disclosure statement, consistent with the requirement that material tax consequences be described in it, does state that the purpose of the bankruptcy is to monetize South Beach's net operating losses. (Amendments made to the Bankruptcy Code in 2005—which don't apply to this case, filed in April 2005—make this disclosure requirement explicit. 11 U.S.C. § 1125(a)(1); 5 *Bankruptcy Service, Lawyer's Edition* § 44:353 (2010). But the requirement has been held to be implicit in the pre-2005 version of section 1125 applicable to this case. See *Hall v. Vance*, 887 F.2d 1041, 1043 (10th Cir. 1989); *In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567, 571 (Bankr. N.D. Ga. 1984).)

The plan of reorganization proposed by South Beach and turned down by the bankruptcy judge and the district judge would have given Scattered all the stock of South Beach. A court can't confirm a plan of reorganization, however, unless the owners of at least one class of "impaired claims" (a term broadly defined to encompass claims altered by the plan, 11 U.S.C. § 1124; *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1321 (7th Cir. 1995);

*In re L & J Anaheim Associates*, 995 F.2d 940, 942-43 (9th Cir. 1993); W. Homer Drake, Jr. & Christopher S. Strickland, *Chapter 11 Reorganizations* § 12:14, pp. 627-28 (2d ed. 2009)), other than "an insider" member of the class, vote to approve it, 11 U.S.C. § 1129(a)(10), and also unless either the owners of all other classes of impaired claims accept the plan, or the other conditions in that subsection for a cramdown (approval of a plan over the objection of one or some of the creditors) are met. 11 U.S.C. §§ 1129(a)(8), (b). A class of claims is deemed to have accepted a plan if creditors (other than the insiders that section 1129(a)(10) excludes from the eligible voters for a plan) vote for it who own at least two-thirds in amount, and more than a half in number, of allowed claims of the class. 11 U.S.C. § 1126(c). Scattered voted for the plan; South Beach had no other creditors; we defer the question whether in the absence of other creditors Scattered's consent was effective.

Had the plan been confirmed, Scattered, as sole creditor of the debtor, would have ended up owning South Beach's net operating losses. South Beach could not have offset those losses against its own income since it has no income or assets (aside from the potential assets consisting of the losses themselves) and no prospects of obtaining any; it is not engaged in any business or investment activities and in fact is defunct, though it remains a corporation in good standing. Consistent with the law of Mississippi (where it is incorporated) for maintaining its corporate status in the absence of an agreement by the shareholders to eliminate the board of directors, South Beach has a single director. Miss. Code Ann. §§ 79-4-

8.01(a), -8.03(b). He is unpaid and inactive, since he does nothing. But he does have, Greenblatt testified, "a beating heart," and no more is required.

Outside of bankruptcy, South Beach's net operating losses could be used to obtain a tax benefit only if the company received a capital infusion that enabled it to obtain income against which to offset the losses, or if its assets (other than the net operating losses) were acquired by a company that had income or assets. For the general rule is that taxpayers may not transfer net operating losses to other taxpayers. *In re Luster*, 981 F.2d 277, 278-79 (7th Cir. 1992); IRS Private Letter Ruling 9622026 (May 31, 1996). If the plan of reorganization were approved, Scattered would become the owner of South Beach and, wanting to extract a tax benefit from South Beach's net operating losses, would transfer capital to South Beach to enable that company to generate income against which to offset the net operating losses. The result would be to shield income of Scattered from federal tax, because South Beach's income would be Scattered's income since Scattered would be South Beach's sole owner.

Consistent with the general rule that we just mentioned, both the Internal Revenue Code and the judge-made tax doctrine of "substance over form" (on which see, e.g., *Gregory v. Helvering*, 293 U.S. 465 (1935); *In re Comdisco, Inc., supra*, 434 F.3d at 965; *Yosha v. Commissioner*, 861 F.2d 494, 497 (7th Cir. 1988); *In re CM Holdings, Inc.*, 301 F.3d 96, 102 (3d Cir. 2002); *Stewart v. Commissioner*, 714 F.2d 977, 987-88 (9th Cir. 1983))

impose limitations on using the purchase of a company as the basis for deducting the company's net operating losses from the purchaser's taxable income. (*Comdisco* applied the doctrine to a net operating loss.) If, for example, the owner of the corporation that has the losses sells his stock, the corporation is not permitted to offset those losses against its future income by more than the income the corporation would have earned if its ownership had not changed and it had invested its capital in tax-exempt bonds. 26 U.S.C. § 382(a); *Garber Industries, Inc. v. Commissioner*, 435 F.3d 555, 557 (5th Cir. 2006); 2 Bittker & Eustice, *supra*, ¶¶ 14.42[3], 14.44[1][b], pp. 14-63, 14-92 to 14-93. That rule is designed to minimize the tax incentive for the change in ownership, lest the change confer a tax benefit on someone (the buyer) other than the previous owner, who had borne the brunt of the net operating losses.

But the statute treats family members (spouses, children, grandchildren, parents) as a single owner, corporations as being owned by their shareholders, and trusts as being owned by their beneficiaries, 26 U.S.C. §§ 318(a)(1), (a)(2)(B), 382(l)(3)(A); 26 C.F.R. §§ 1.382-2T(h)(2), (6), 2 Bittker & Eustice, *supra*, ¶ 14.43[2][d], pp. 14-71 to 14-72, and these attribution rules might allow the purchase by Scattered of South Beach without triggering the application of section 382(a), though the record is too sketchy for us to be confident of that conclusion.

Corporations in Chapter 11 bankruptcy, moreover, are allowed to match net operating losses against income beyond what is permitted by section 382(a) if immediately after the reorganization the debtor's shareholders

and its "qualified creditors" (which include creditors, like Scattered, who have held debt for at least 18 months prior to the filing of the bankruptcy proceeding) own at least half the stock by virtue of their prior status. 26 U.S.C. § 382(*l*)(5); 2 Bittker & Eustice, *supra*, ¶ 14.44[6], pp. 14-102 to 14-106. The thinking behind section 382(*l*)(5) is that in bankruptcy the creditors rather than the shareholders are the true owners of the corporation, so there's no real ownership change when the creditors receive the stock of the corporation. 7 *Mertens Law of Federal Income Taxation*, § 29:158 (2010). Consistent with this thinking, the statute imposes certain restrictions on the deduction of net operating losses. See 26 U.S.C. § 382(*l*)(5)(B); 7 *Mertens*, *supra*, § 29:158; 2 Bittker & Eustice, *supra*, ¶ 14.44[6][a], p. 14-103. But we needn't get into these; we can just assume that Scattered's plan is not vulnerable under section 382.

Section 269(a)(1) of the Internal Revenue Code, however, which overlaps the doctrine of substance over form and imposes restrictions on obtaining tax benefits from net operating losses beyond the restrictions imposed by section 382, disallows deductions and other tax benefits, including net operating losses, 7 *Mertens*, *supra*, § 38:97, when the principal purpose of acquiring corporate control, or of certain other intercorporate transactions, on which the claim of benefits is based is to avoid tax. To preserve the tax benefits of the transaction the taxpayer must demonstrate that business reasons unrelated to tax avoidance were the primary purpose of the transaction.

The attribution rules of 26 U.S.C. § 318 don't apply to section 269; for section 318 applies only when expressly

made applicable to other provisions in subchapter C of the tax code, and it hasn't been made expressly applicable to section 269, which anyway is not in subchapter C. But a beneficial owner of a company is deemed to control it for section 269 purposes; so if he subsequently becomes its legal owner, there is no acquisition of corporate control and so the change in ownership does not trigger the restrictions imposed by the section. See *Ach v. Commissioner*, 358 F.2d 342, 345-46 (6th Cir. 1966); Rev. Rul. 70-638 (1970); IRS Field Service Advisory 200202057 (Jan. 11, 2002); 7 *Mertens*, *supra*, § 38:89 n. 5.

Greenblatt *may* be the beneficial owner of both Scattered and South Beach, though this is uncertain, since Scattered is owned by two other companies and a trust set up for Greenblatt's father and children, while South Beach is owned by NOLA, which is owned by Greenblatt's father and the fathers of the two other directors. But because the attribution rules of section 318 don't apply to section 269, the ownership of South Beach can't be ascribed to Scattered even if Greenblatt *is* the beneficial owner of both corporations; and since Scattered therefore is not the beneficial owner of South Beach, its acquisition of South Beach can't escape the bar of section 269(a)(1). *Brick Milling Co. v. Commissioner*, T.C. Memo 1963-305; IRS Rev. Rul. 80-46 (Feb. 25, 1980); 2 Bittker & Eustice, *supra*, ¶ 14.41[3][d], p. 14-51.

So it looks as if the plan of reorganization, even if approved, wouldn't confer the tax benefit that Greenblatt sought. But that doesn't affect whether the plan was rightly rejected; for South Beach's disclosure state-

ment suggests no purpose other than to beat taxes, and we know that a plan of reorganization may not be confirmed if that is its principal purpose, whether or not the purpose will actually be accomplished or will be nixed later by the Internal Revenue Service. The object of bankruptcy is to adjust the rights of the creditors of a bankrupt company; it is not to allow a solvent company to try to lighten its tax burden.

The plan of reorganization also had to be rejected on the closely related ground that it hadn't been proposed in good faith. 11 U.S.C. § 1129(a)(3). To be in good faith a plan of reorganization must have a true purpose and fact-based hope of either "preserving [a] going concern" or "maximizing property available to satisfy creditors." *Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 453 (1999); see also *In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir. 1984). At the onset of the series of transactions among Greenblatt's puppet firms, South Beach was solvent. At the end it was insolvent as a result of having been directed by Greenblatt to borrow money from another Greenblatt company, money that South Beach could not repay to Scattered (the company controlled by Greenblatt to which the loan had been assigned), because South Beach had lent the borrowed money to NOLA, which went broke. The series of transactions set the stage for Scattered, as sole creditor of a bankrupt firm, to acquire South Beach in a Chapter 11 reorganization. There were no outside creditors. Their absence, and thus the absence of any real debt or real creditors, shows that this case doesn't belong in bankruptcy court. *In re*

*Coastal Cable TV, Inc.*, 709 F.2d 762, 764-65 (1st Cir. 1983); *Furness v. Lilienfield*, 35 B.R. 1006, 1012 (D. Md. 1983); *In re Stern*, 50 B.R. 285, 288 (Bankr. E.D.N.Y. 1985); *In re Setzer*, 47 B.R. 340, 346 (Bankr. E.D.N.Y. 1985); *In re Maxim Industries, Inc., supra*, 22 B.R. at 613.

Scattered contends that there was another motive for the bankruptcy besides the tax motive, and that was to shield South Beach from suits. The argument is bogus. South Beach's bankruptcy schedule listed no claims other than Scattered's, and the deliberate omission of creditors from the list submitted by the debtor is unlawful and is grounds for dismissal of the bankruptcy proceeding. 11 U.S.C. §§ 521(a)(1), 1112(e); *In re Seaman*, 340 B.R. 698, 702-03 (Bankr. E.D.N.Y. 2006); see also *In re Haga*, 131 B.R. 320, 325-26 (Bankr. W.D. Tex. 1991). Scattered argues that bankruptcy would shield South Beach from being sued by creditors of its parent, NOLA, such as Wachovia, Prudential Securities, and the bankruptcy trustee of MJK Clearing, Inc., rather than by its "own" creditors. But creditors in bankruptcy include anyone who has a claim against the debtor, which is defined broadly as any right to payment; it needn't be a claim arising from a contractual relation with the debtor. 11 U.S.C. §§ 101(5), (10); *Johnson v. Home State Bank*, 501 U.S. 78, 83-84 (1991); *Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000); *In re WorldCom, Inc.*, 546 F.3d 211, 216 (2d Cir. 2008). And it's odd to think that South Beach would ever be the target of a suit, since it's a shell. It does have the net operating losses, but we cannot see how they could be used by a judgment creditor to obtain a tax benefit, for that would be at the

expense of the Treasury Department rather than of the wrongdoer.

Greenblatt's *other* enterprises are targets of a number of suits, see, e.g., *Wachovia Securities, LLC v. Neuhauser*, No. 04 C 3082, 2004 WL 2526390 (N.D. Ill. Nov. 5, 2004); *In re MJK Clearing, Inc.*, 408 F.3d 512 (8th Cir. 2005); *In re MJK Clearing, Inc.*, 241 F.R.D. 491 (N.D. Ill. 2007), unsurprisingly given Greenblatt's well-earned reputation for sailing close to the wind; and if he transferred money from Scattered to South Beach to take advantage of the latter's net operating losses, South Beach might become a secondary target of the suits. In the 2007 *MJK Clearing* case, the trustee in bankruptcy sought an order that NOLA turn over to him its stock in South Beach. But Scattered is not about to fund South Beach so that it can pay judgments. It will receive no capital infusion from Scattered unless and until it has emerged from bankruptcy. Bankruptcy is therefore not required for the protection of South Beach from litigation—not to mention the fact that to make a firm that one controls insolvent in order to make it judgment proof, or to otherwise shield assets from judgment creditors, is not a proper invocation of bankruptcy law. See *Shapiro v. Wilgus*, 287 U.S. 348, 355 (1932) (Cardozo, J.); 7 *Collier on Bankruptcy*, *supra*, ¶ 1112.07; see also *In re 15375 Memorial Corp.*, 589 F.3d 605, 625-26 (3d Cir. 2009); *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023, 1026-28 (11th Cir. 1989).

The bankruptcy judge and the district judge had still another ground for denying confirmation of the proposed plan of reorganization, illustrating what a travesty

this bankruptcy proceeding is: South Beach's sole creditor—Scattered—is an insider of South Beach. Remember that a plan of reorganization can't be confirmed unless "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The only claim alleged to be impaired by the plan is Scattered's claim to the money it is owed by virtue of having bought Loop's loan to South Beach. Scattered voted to accept the plan but was an insider of the debtor when it did so, because Greenblatt controls South Beach, Loop, and Scattered. And while "insider" includes a "person in control of the debtor," 11 U.S.C. § 101(31)(B)(iii), it is not limited to such persons; it includes any entity so closely related to the debtor as to "suggest that any transactions were not conducted at arm's length." *In re Winstar Communications, Inc.*, 554 F.3d 382, 396-97 (3d Cir. 2009); see also *In re Krehl*, 86 F.3d 737, 742-43 (7th Cir. 1996); *In re U.S. Medical, Inc.*, 531 F.3d 1272, 1277-78 and n. 5 (10th Cir. 2008); *In re AFI Holding, Inc.*, 355 F.R. 139, 152-53 (B.A.P. 9th Cir. 2006). That condition obviously is satisfied here.

We recall that acceptance by a class of claims requires approval by two-thirds (in amount) and more than one-half (in number) of the claimants, excluding insiders. 11 U.S.C. §§ 1126(c), 1129(a)(10). With Scattered excluded because of its insider status, there are no eligible voters.

The exclusion of insiders in deciding whether a plan has been accepted by impaired creditors is intended to prevent conflicts of interest that can arise when a

creditor has substantial influence over the debtor beyond what is implicit in being a creditor. See *In re U.S. Medical, Inc., supra*, 531 F.3d at 1277-78; *In re Friedman*, 126 B.R. 63, 69-70 (B.A.P. 9th Cir. 1991). It brakes cramdowns by ensuring that some disinterested creditors have approved the plan. See, e.g., *In re Combustion Engineering, Inc.*, 391 F.3d 190, 243-44 (3d Cir. 2004); *In re Windsor on the River Associates, Ltd.*, 7 F.3d 127, 131 (8th Cir. 1993); 7 *Collier on Bankruptcy, supra*, ¶ 1129.02[10][a], p. 1129-50 and n. 178. This cannot be a concern in the present case, however, because the *only* creditor is an insider. There is no risk of collusion between an insider creditor and the debtor at the expense of other creditors, and that takes the case out of the intended scope of section 1129(a)(10), though not out of the approval requirement. But even though the purpose of section 1129(a)(10) is not engaged here, the fact that only insiders are involved or interested in the bankruptcy (apart from the U.S. Trustee!) helps show why this bankruptcy doesn't serve the purposes of bankruptcy law—and why no alternative plan is conceivable. For while the question presented by the appeal is whether the plan tendered by South Beach should have been confirmed, the bankruptcy judge was right to dismiss the bankruptcy proceeding rather than give South Beach (realistically, Scattered) a chance to propose an alternative plan. No confirmable alternative plan is conceivable. See 11 U.S.C. § 1112(b); *In re Hedquist*, 450 F.3d 801, 804 (8th Cir. 2006); *In re American Capital Equipment, Inc.*, 405 B.R. 415, 426-27 (Bankr. W.D. Pa. 2009); 7 *Collier on Bankruptcy, supra*, ¶¶ 1112.04[5][a], [c], 1112.07, pp. 1112-23 to 1112-24, 1112-26, 1112-49 to 1112-62.

It is true that at an earlier stage of the bankruptcy proceeding the district court reversed the bankruptcy judge's ruling that the petition for bankruptcy had been filed in bad faith and should therefore be dismissed. The reversal was not necessarily error, because all the facts were not yet before the bankruptcy court or the district court. Scattered's argument that the district court's finding that the petition had not been filed in bad faith is "law of the case" and cannot be reexamined by us is frivolous, because the doctrine of law of the case limits reexamination of a ruling in an earlier stage of a litigation by the same court, not by a higher court. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 881 n. 1 (1990); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir. 2007). And anyway the doctrine doesn't bar reexamination of a ruling even by the same court if there is a compelling reason for reexamination, *Agostini v. Felton*, 521 U.S. 203, 236 (1997); *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006), as there was here because the facts brought out in the confirmation hearing showed that the bankruptcy had been filed in bad faith.

Greenblatt's evasive and at times incredible testimony, and his orchestration of a scheme aimed at a palpable misuse of bankruptcy, raise serious ethical and perhaps legal concerns. The appeal to the district court and now to our court was frivolous, and we invite the U.S. Trustee to consider applying for sanctions against Scattered and South Beach, Greenblatt, the appellants' law firms, and the firms' lawyers who worked on the case, for misconduct in the bankruptcy and district courts. And we order the appellants, and the law firms and lawyers that appeared

for them in this court, to show cause why they should not
be sanctioned for their conduct here.

AFFIRMED AND SHOW-CAUSE ORDER ISSUED.